**GENERAL MOTORS CORPORATION, Appellant,**

v.

**Mel Anthony HARPER, Individually and as Personal Representative of the Estate of Jerry W. Harper, deceased; Roy William Harper; and Wilma Louise Harper, Appellees.**

**No. 11–01–00075–CV.**

Court of Appeals of Texas, Eastland.

Oct. 25, 2001.

Rehearing Overruled Dec. 13, 2001.

120

Christina Wheeler, David Heilbron, Frank Hinman, Monty Agarwal, Simona Gurevich, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, George Boll,

R. Chris Harvey, Strasburger & Price, S. Vance Wittie, Sedgwick, Detert, Moran & Arnold, Dallas, for appellant.

Charles M. Noteboom, Noteboom & Gray, Hurst, Gregory Jensen, James H. Holmes, III, Burford & Ryburn, Dallas, John Hill, Jr., M. Wade Turner, Locke Liddell & Sapp, Houston, Patricia Shackleford, David Perry, Rene Haas, Perry & Haas, Corpus Christi, for appellees.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

### Opinion

TERRY McCALL, Justice.

General Motors Corporation (GM) appeals from a judgment, based on a jury verdict, awarding appellees $16,506,764.23 in compensatory damages plus prejudgment interest and $31,000,000 in punitive damages. In its first three issues, GM asserts that there was no evidence or, in the alternative, factually insufficient evidence of defect and of causation and that the trial court erred in admitting evidence of patents. Because we find that there is no evidence of defect or of causation, we reverse and render a take-nothing judgment for GM.

### Background Facts

On August 7, 1993, Jerry W. Harper was driving north in a 1990 full-sized GM pickup when Linda V. Armstrong, driving south in a Ford Bronco II, crossed the center of the road and hit Harper almost head on. The frontal collision fractured Harper's neck and rendered him a quadriplegic. Harper died in 1997. The jury found that Armstrong was 10 percent responsible for Harper's injury and that GM was 90 percent responsible for his injury.

At the time of the accident, Harper had a chronic condition called ankylosing spondylitis (AS), a disease of the spine that affects about .1 percent of the population and that had calcified and fused Harper's vertebrae. Dr. Joseph Lawson Burton, appellees' causation expert, acknowledged that Harper's spine was brittle and fragile; he agreed with the other experts that an AS spine is more susceptible to trauma than a normal spine and that even a minor trauma, such as falling out of a bed or chair or stepping off a curb incorrectly, could fracture an AS spine. Harper's neck was in a permanently flexed forward position. Dr. Stanley Cohen, Harper's doctor since 1990, testified that, when Harper placed his back against a wall, his head was 6 to 8 inches or about 30 degrees from the wall. Dr. Burton testified that Harper's neck could not flex forward or backward more than 15 degrees without breaking.

Dr. Burton described Harper's injury from the collision as a flexion/compression or "diving" injury "where the head is arrested by some object and the body keeps wanting to go toward the head." There were only three pieces of physical evidence to support his theory: a smudge on the pickup's back window found by appellees' design expert over a year after the accident, a cut at the vertex/apex (top) of Harper's head, and X rays of Harper's injury. Dr. Burton opined that the smudge was likely left by the impact from Harper's head, that the cut on the apex of his head was from his head's contact with the back window, and that the X ray showed anterior compression and posterior distraction which is indicative of a flexion/compression injury.

### Appellees' Theory of GM's Defective Design

Appellees argue on appeal that Harper's injury would have been prevented by either a head restraint or a less elastic seat belt; however, that was not their conten-

tion at trial. Indeed, appellees' brief describes the accident:

> Upon impact, [Harper's] body shifted forward toward the steering wheel and then, caught by a shoulder belt that expanded and snapped back like a rubber band, rebounded violently toward the rear window of the truck, where his buttocks lifted slightly from the seat, and his head stopped his body's backward motion by slamming into the rear window.

Counsel for appellees represented to the trial court that GM's restraint system was defective because of a lack of a head restraint *and* because of the excessive restraint rebound:

> Again, [defense] counsel confuses our defect claim versus our causation claim. Our defect claim *is and always has been that there was both excessive restraint rebound and lack of head restraint, and those combined to create the defect.* (Emphasis added)

At the conclusion of Dr. Burton's direct testimony, appellees' trial counsel asked Dr. Burton if he had an opinion based on whether Harper's injury would have been prevented if GM had installed a head restraint *and* a seat belt mechanism that "would not have flung him back towards the [back window]." Dr. Burton expressed his opinion as follows:

> That if those things occurred, that we decreased the rebound energy, and we capture his head and neck with a headrest, that he would not be a quadriplegic, and he would have not died from complications of the quadriplegia.

Appellees' case on defective design was premised upon the combination of an overly elastic seat belt and the lack of a head restraint.[1] The legal sufficiency of the

evidence will be measured against that combination as described by appellees' causation and design experts as the basis for their opinions.

*Standard of Review for Legal Sufficiency*

■ In reviewing the legal sufficiency of the evidence, an appellate court must consider all the evidence in the light most favorable to the prevailing party and must indulge every reasonable inference in favor of the prevailing party. *Associated Indemnity Corporation v. CAT Contracting, Inc., GTS,* 964 S.W.2d 276, 285–86 (Tex.1998); *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). An appellate court will sustain a no-evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the only evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Company v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). Any evidence supporting the jury's finding that is of probative value and that is more than a scintilla is legally sufficient to uphold the finding. *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996); *Burroughs Wellcome Company v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Transportation Insurance Company v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994).

1. Appellees' counsel likewise framed the question in terms of the combination when he asked Steven Richard Syson, appellees' design expert, for an expert opinion.

## Proving a Design Defect

■ To establish a design defect, a plaintiff must prove (1) that the design renders the product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use, and (2) that a safer alternative design exists which would substantially reduce the risk of injury and be economically and technologically feasible. *General Motors Corporation v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999).[2]

The principal utility of a vehicle's restraint system is to reduce the driver's or passenger's movement after a crash to prevent or lessen injuries from a second collision of that person with something inside the vehicle. Many factors, such as forces upon the body and how to dissipate energy from a crash, must be taken into account in designing a restraint system. Experts on both sides agreed that the proper design philosophy is to "protect the largest group of people." They further agreed that for drivers a head or chest impact with the steering wheel is the principal risk in frontal collisions.

■ The National Highway Traffic Safety Administration (NHTSA) conducts safety tests and issues federal motor vehicle safety standards for the automobile manufacturers. Compliance with NHTSA regulations provides a presumption of no design defect. *Sims v. Washex Machinery Corporation,* 932 S.W.2d 559, 565 (Tex. App.—Houston [1st Dist.] 1995, no writ).

■ It was not disputed that GM complied with NHTSA standards, that GM's polyester belting was the industry standard, and that the same belting system was the accepted system used by manufacturers worldwide for pickups without airbags. The design's utility of preventing the driver from impacting the steering wheel was demonstrated in this crash. Dr. Burton testified that the forces acting on Harper's body as he went forward were 12–14 Gs and that the forces as he went back would have been 3–4 Gs. Yet, it was undisputed that Harper was not injured by hitting the steering wheel, the principal risk in a frontal collision. It is clear from this accident that the design of GM's belting prevented the driver from excessive forward movement; thus, the principal risk was clearly outweighed by the utility of the design in preventing that risk.

■ Appellees contend, however, that there was another risk—the likelihood and gravity of harm from rebound caused by GM's belting—and that GM should have utilized appellees' proposed alternative webbing or some type of energy absorbing device.[3] However, appellees offered no ev-

---

2. TEX. CIV. PRAC. & REM. CODE ANN. § 82.005 (Vernon 1997), which became effective on September 1, 1993, provides:

> (a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:
> (1) there was a safer alternative design; and
> (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.
> (b) In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:
> (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and
> (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

3. See David G. Owen, *Toward a Proper Test for Design Defectiveness: "Micro Balancing"*

idence to demonstrate that their alternative webbing or other energy absorbing ideas were as safe as GM's webbing in terms of protecting the greatest number of drivers from the greatest risk, that of the driver impacting the steering wheel. That appellees' alternative design might have avoided Harper's flexion/compression injury does not prove that GM's belting was defective. As the reporters for The Restatement (Third) of Torts: Products Liability state in their Comment b to Section 16:

> The factors enumerated in § 2, Comment f, for determining the reasonableness of an alternative design and the reasonable safety of the product are fully applicable to establishing defect in an increased-harm case. Furthermore, the alternative to the product design must increase the overall safety of the product. It is not sufficient that the alternative design would have reduced or prevented the harm the plaintiff suffered if the alternative would introduce into the product other dangers of equal or greater magnitude.

*Costs and Benefits*, 75 TEX. L. REV. 1661, 1675 (1997).

4. Some of the statements contained in the non-GM patents and read to the jury are the following:

> Elastic elongation of a safety belt is not desirable because the elastic rebound of the wearer after sudden elongation of the belt may cause fracture of the cervical vertebrae.
>
> After the passenger's forward velocity is terminated, the energy stored in many of the present restraint systems may be elasticity returned causing the passenger to rebound. This may occur because the restraint system elongates during the transfer of energy from the passenger to the system in a manner generally similar to a linear spring.
>
> Naturally, it would be desirable to reduce the peak load to which the passenger is

Steven Richard Syson testified as appellees' design expert at trial. A substantial portion of his testimony involved patents that Syson downloaded from the internet. Thus, we will first address GM's second issue.

### Admission of Patents

GM asserts in its second issue that five patents were erroneously admitted into evidence over hearsay and relevancy objections. Appellees respond that the exhibits were self-authenticating, official government publications which proved the existence of the patents and that they were "relevant to show the state of knowledge in the automotive industry as early as 1968." The patents, which were issued by the United States Patent Office between 1971 and 1975 for inventions involving various energy-absorbing devices in vehicle restraint systems, were relevant in this case. TEX.R.EVID. 401.

The patents, however, contain various statements made by the persons procuring the patents.[4] Although the patents themselves were admissible under the

> subjected as well as the rebound caused by such restraint systems.
>
> The belt is usually elastic, and this can sometimes result in the passenger being "whipped" back into his seat in the moments after an impact. Since the belts are applied to the passenger's torso, the head is subjected to a sudden jerk when the passenger hits the seat and this jerk can, in extreme conditions, break the neck of the passenger.
>
> [T]he restraining safety belt, particularly the shoulder belt, elastically elongates, so that upon the occupant reaching his forward-most position he is sharply flung rearwardly by the contraction of the elastically elongated belt and this reaction is a common cause of injury, frequently very seriously, to the occupant, as for example, with a resulting broken cervical vertabrae (sic).

None of the statements were relevant to the elasticity of polyester belting.

public records exception to the hearsay rule, TEX.R.EVID. 803(8), the statements within the non-GM patents constituted inadmissible hearsay. See TEX.R.EVID. 805. One of the five patents admitted into evidence was assigned to GM and, therefore, constitutes an admission of a party opponent. *Church & Dwight Co., Inc. v. Huey,* 961 S.W.2d 560, 571 (Tex.App.—San Antonio 1997, pet'n den'd). When part of a document contains hearsay and part of it is admissible, the objection should point out the statements claimed to be hearsay and specifically object to those statements. *Brown & Root v. Haddad,* 142 Tex. 624, 180 S.W.2d 339, 342 (1944). GM, however, made only a general hearsay objection to each patent and did not specifically object to the hearsay contained within the patents. A general objection to evidence as a whole, which does not point out specifically the portion objected to, is properly overruled if any part of that evidence is admissible. *Speier v. Webster College,* 616 S.W.2d 617, 619 (Tex.1981); *Brown & Root v. Haddad,* supra. Even if its objections had been specific, GM failed to request a limiting instruction. TEX.R.EVID. 105(a). Consequently, the trial court did not abuse its discretion in admitting the patents into evidence. We overrule GM's second issue.

### Evidentiary Value of the Patents

Neither the patents that were introduced into evidence nor the statements in the patents support the jury's findings as to defect or causation. First, these patents predated the switch from nylon to polyester belts. The rebound problem that was noted in some of the non-GM patents related to the elasticity of nylon belts. It was undisputed that nylon inherently has more stretch than polyester. The belt in Harper's pickup was polyester. Second, nothing in the patents compared the safety of the patented inventions with the restraint system used in Harper's pick-up. Next, only one of these patents, the Takata webbing, was discussed in much depth by appellees' experts. Syson testified that the Takata webbing was the alternate design that GM should have used; it is discussed elsewhere in this opinion in more detail. Finally, Syson admitted that the benefits claimed in the patents were not necessarily accurate, workable, or manufacturable. We hold that the patents and the statements constituted no evidence of either a safer alternative design or of causation.

### Analysis of Appellees' Defect Claim

Appellees did not provide any evidence of flexion/compression neck injuries resulting from rebound in a frontal crash. Much of their evidence related to whiplash neck injuries from a rear impact, the need for head restraints to prevent whiplash neck injuries in a rear impact, the contention that rebound is a problem in frontal crashes, and the contention that the GM belting causes "too much" rebound. We will assume with appellees that rebound is a problem. Our focus will be on whether appellees proved that there was an alternative seat-belting design that would have been safer overall than GM's belting design.

Syson claimed that the GM seat and shoulder belting was defective because it was too elastic and because it had a shoulder belt that was too long. As to the elasticity, Syson testified:

> Well, the seat belt fabric is springy, so it does have some elasticity, *and that elasticity is what stores the energy and causes the rebound movement* or the rearward movement of the occupant, even in a frontal crash. (Emphasis added)

He confirmed at another point in his testimony that it is the elasticity or stretching

of the GM belting that is the defect. Following is the question by appellees' counsel and Syson's answer:

Q. [The] elastic elongation being undesirable because of the elastic rebound, is that the same thing we have been talking about as restraint rebound?

A. Yes, it is.

Syson relied principally on a Takata seat belt webbing referred to in a 1973 patent as his "safer" alternative design. He claimed that it would reduce rebound without increasing the driver's forward movement any more than GM's webbing. That unsupported statement was contradicted by Syson's own testimony concerning the physical characteristics of the Takata webbing and those of GM's webbing. He agreed that the Takata webbing absorbs energy by stretching or elongating and that the Takata webbing stretches by 40 percent at 2,500 pounds force versus 6 to 8 percent for the GM webbing. Although he contended that the Takata webbing would meet the Federal Motor Vehicle Safety Standard limit for stretching, Syson acknowledged that "it's right at the outer limit of that." Syson did not dispute that, although Takata is the largest seat belt manufacturer in the world today, no vehicle manufacturer has ever used the Takata webbing discussed in the 1973 patent.

■ Syson testified that the Takata webbing had been publicly tested and proven, but he mentioned only two magazine articles and an unspecified test by the U.S. Navy as the basis for his claim. The first test he referred to was described in a 1974 Society of Engineering article. The trial court ruled that the article was inadmissible as hearsay but that Syson could refer to it as a learned treatise. TEX. R.EVID. 803(13). Syson testified only

that "no one was injured" during the test. Apparently, the test compared the Takata webbing to the standard nylon systems then in use. We note that the GM polyester belting system was developed later. More in point, Syson conceded on cross-examination that the test did not involve steering wheels and steering columns being in front of the vehicle's occupant. That test constitutes no evidence that the Takata webbing would protect a driver from the principal risk of impacting a steering wheel.

The only other test referred to by Syson was one described in a 1980 article.[5] This article also is not in evidence because of its hearsay characteristics. Syson conceded that the article concluded that Calspan, a research firm that did the tests, had recommended not using the Takata webbing because of the danger of the driver impacting the steering wheel due to the 40 percent stretch of the webbing. Two GM experts testified that the tests discussed in the magazine articles showed that too many drivers would impact the steering wheel in frontal crashes. Edward R. McKenna, a GM expert, stated that the Takata webbing had never been used in a passenger car or truck.

Appellees contend that Syson was also talking about the design of GM's seat and shoulder belt and how it was installed. Here is his testimony:

Q. [I]s there anything that happens that would cause [a driver] to have [his] head go backwards against the window?

A. Well, in this design of seat belt system, yes.

Q. Explain to us what that is?

A. Well, the seat belt in this vehicle has a very long shoulder belt, and that long shoulder belt stores up a lot of

---

**5.** Syson did briefly refer to a test of the Takata webbing by the U.S. Navy; but, apparently, it was not related to testing for use as belting for vehicle drivers.

energy, and throws the driver back after the crash.

Syson then described the routing loop, where the bolts are located, and the fact that GM has a two-spool retractor and two separate belts. He made no effort to say why this was a bad design other than his statement that "this vehicle has a very long shoulder belt." The only other statement by Syson concerning GM's design was:

> I didn't say the specification was wrong. I said that the belt, the way it's designed and installed in the vehicle, gives you too much rebound velocity. The specification for the [polyester] webbing, I have no complaints about that.[6]

 McKenna testified that GM's system has emergency locking retractors that lock the seat belt and the shoulder belt automatically just before the occupant moves after a crash. Appellees did not dispute GM's evidence that Harper's restraint system worked as designed. Thus, any forward movement would only be due to stretch in the belting; it is not clear what Syson meant by the shoulder belt being "very long" or how it caused "too much" rebound velocity. Syson did not elaborate on how the GM belting was defectively designed or how it should have been designed differently. Unsupported statements that an alternative design would be safer is no evidence. *General Motors Corporation v. Sanchez*, supra at 591; see *Schaefer v. Texas Employers' Insurance Association*, 612 S.W.2d 199, 202 (Tex.1980)(no evidence on causation despite "magic words" where testimony relied on possibility and surmise).

Syson's testimony on a safer alternative may be summarized and analyzed as follows:

(1) GM should have used the Takata webbing. But there is no evidence that it would have protected drivers from the greatest risk-that of impacting the steering wheel. To the contrary, it was undisputed that the Takata webbing has much greater stretch than GM's, that the Calspan research firm had rejected it for drivers, and that no manufacturer had ever used it in the production of vehicles.

(2) GM's shoulder strap was too long and caused rebound. But Syson did not say how it should be redesigned.

(3) Some type of energy absorbing device should have been used. But Syson provided no evidence of an energy absorbing device (other than the Takata webbing) except to refer to some of the items described in the patents. He admitted that benefits claimed in patents were not necessarily accurate, workable, or manufacturable. He did not demonstrate how any of the items would have prevented Harper's injury nor had he tested any of them. The record reflects that there were independent companies that did crash testing, and there appeared to be no reason why Syson could not have tested his alternative ideas. Syson's testimony relied on possibility and surmise.

Appellees argue that energy absorbing devices are widely used in cars today, but Syson admitted that this was not really the case until the advent of airbags to prevent the driver from impacting the steering wheel. Also, the energy absorbing devices described in the patents were primarily designed to solve the elasticity problem of nylon belting. The GM belting was polyester.

---

6. On redirect, Syson mentioned that some diesel powered GM pickups have energy management loops in the belt, but he did not test or otherwise demonstrate how the loops would perform in a crash similar to Harper's.

■ GM did not object to Syson's testimony nor was it necessary to do so under our reading of *General Motors Corporation v. Sanchez,* supra, and *Maritime Overseas Corporation v. Ellis,* 971 S.W.2d 402 (Tex.), *cert. den'd,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). GM's no-evidence point is that appellees provided no evidence of a safer design and that the undisputed evidence was that the Takata webbing was more dangerous for drivers. GM is not contending that Syson's testimony constituted no evidence because it was based on unreliable, scientific methodology.

In *Maritime Overseas Corporation v. Ellis,* supra at 409, the Texas Supreme Court held that a complaining party must object to the reliability of *scientific evidence* before trial or when the evidence is offered; otherwise, the complaint is waived. The court cited *Merrell Dow Pharmaceuticals, Inc. v. Havner,* supra at 713, and *E.I. du Pont de Nemours and Company, Inc. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995), for its holding. The court discussed the special nature of scientific expert testimony and the trial court's responsibility for making the preliminary determination of whether the proffered testimony meets the standards for scientific reliability. *Maritime Overseas,* like *Robinson* and *Havner,* involved a scientific theory on causation. The issue in *Maritime Overseas* was whether exposure to Diazinon can cause long-term neurotoxicity. Because scientific testimony is unique and is often strongly contested, especially on causation issues, the court reasoned:

> Without requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush.

*Maritime Overseas Corporation v. Ellis,* supra at 409.

Because of *Maritime Overseas'* unusual procedural history, it is not clear how broadly the court will apply its waiver rule. See Judge Harvey Brown, *Procedural Issues Under Daubert,* 36 HOUS. L. REV. 1133, 1160–68 (1999). We believe that the *Maritime Overseas'* waiver rule is limited to the question of whether the basis for the expert's opinion depends on a reliable scientific methodology.

The Texas Supreme Court in *General Motors Corporation v. Sanchez,* supra, indicated that a challenge to the reliability of *scientific* evidence after trial comes too late. *General Motors Corporation v. Sanchez,* supra at 590. Although the court said that GM's arguments went to the reliability and admissibility of the plaintiff's expert evidence, the court detailed the expert's evidence and found it to be legally sufficient. Scientific methodology was not at issue in *Sanchez,* only an engineering design. Significantly, the Supreme Court distinguished *Burroughs Wellcome Company v. Crye,* supra, and *Schaefer v. Texas Employers' Insurance Association,* supra. The *Sanchez* court observed that the expert's opinion in *Schaefer* "was founded upon mere possibility, speculation, and surmise" and that the expert's opinion in *Burroughs Wellcome* was "without probative value and cannot support a verdict or judgment" because "the only facts in evidence contradict the assumption of the expert upon which his opinion is based." Thus, the distinction between admissibility and legal sufficiency will still be observed, except that a legal sufficiency claim can be waived to the extent that the claim questions the reliability of the science and its methodology.

Both this court and the Texas Supreme Court in *Schaefer* were careful to note that the scientific theory was not under attack.

*Texas Employers' Insurance Association v. Schaefer*, 598 S.W.2d 924 (Tex.Civ. App.—Eastland), *aff'd, Schaefer v. Texas Employers' Insurance Association*, 612 S.W.2d 199 (Tex.1980). It was agreed that the plaintiff's disease was caused by mycobacteria intracellularis bacteria, some serotypes of which are pathogenic to birds. The expert testified that the plaintiff contracted the disease by working as a plumber in soil contaminated with bird feces. What was missing was any evidence that the bacteria was in any soil where he worked. *Schaefer v. Texas Employers' Insurance Association*, 612 S.W.2d at 202. Also, the expert admitted that no serotyping tests had been done to determine whether the plaintiff had an avian strain, for which birds are the pathogen, or a non-avian strain of the disease. In our case, Syson did no testing to determine whether his suggested alternative Takata webbing or any other suggestion was safer in terms of preventing the driver from hitting the steering wheel and would be safer overall.

The expert in *Burroughs Wellcome* based his opinion that the Polysporin TM spray caused a frostbite injury on his assumption that the plaintiff's foot turned white immediately upon application of the spray. He further stated that, if the plaintiff's foot was red after the spray was applied, then his diagnosis would have been different. The plaintiff in a deposition and her husband at trial testified that the plaintiff's foot turned red after the spray was applied. *Burroughs Wellcome Company v. Crye*, supra at 499. Finding that there was no evidence on causation, the Supreme Court stated:

> When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion

is without probative value and cannot support a verdict or judgment. See *Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 202–05 (Tex.1980).

*Burroughs Wellcome Company v. Crye*, supra at 499.

The scientific principles involved in Syson's testimony were not challenged. GM acknowledged that Takata webbing does absorb energy because of its weave and its stretching. The problem is that Syson did not demonstrate that the Takata webbing was safer than the GM belting. Syson did no test to see if Takata webbing or other energy absorbers would prevent drivers from hitting the steering wheel.[7] The undisputed testimony of two GM experts and of Syson concerning the Calspan article was that Takata webbing should not be used as part of a restraint system for drivers. Syson's opinion that the Takata webbing was safer was based on an assumption that was rebutted by the evidence. *Burroughs Wellcome Company v. Crye*, supra.

We sustain GM's first issue without reaching the factual sufficiency claim.

### Proving Causation

In the third issue, GM challenges the legal and factual sufficiency of the evidence on the issue of causation. To establish liability for a design defect, a plaintiff must prove that the defect was a producing cause of his injury. A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Union Pump Company v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Included

---

**7.** There also was no evidence of Takata's rebound properties, only Syson's conclusory statement that the rebound would be less.

within producing cause is cause in fact, which means that the defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct. *Union Pump Company v. Allbritton*, supra; *General Motors Corporation v. Saenz*, 873 S.W.2d 353, 357 (Tex.1993). Therefore, appellees must have proved that the defect in the restraint system was a cause of Harper's injuries. See RESTATEMENT (THIRD) OF TORTS §§ 1, 15, & 16 (1998).

### Standards for Scientific Evidence

 We review the legal sufficiency of the evidence under the well-recognized standard of review previously set out in this opinion. In applying that standard of review, we are aware that "an expert's bald assurance of validity" of the underlying technique or methodology in support of his testimony is not enough to constitute some evidence. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, supra at 712; *E.I. du Pont de Nemours and Company, Inc. v. Robinson*, supra at 559. There must be objective, independent validation of the expert's methodology. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, supra. The Texas Supreme Court in *Merrell Dow* and *Robinson* set forth some of the factors that courts should consider in looking beyond the bare opinion of the expert. Those factors include:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses that have been made of the theory or technique.

*Merrell Dow Pharmaceuticals, Inc. v. Havner*, supra at 714; *E.I. du Pont de Nemours and Company, Inc. v. Robinson*, supra at 557. The court in *Merrell Dow* applied these factors to a no-evidence review based on the unreliability of scientific evidence on the issue of causation.

### Analysis of Dr. Burton's Testimony

GM challenged the admissibility and the reliability of Dr. Joseph Lawson Burton's testimony by a *Daubert/Robinson*[8] motion and hearing. The trial court denied GM's motion and allowed Dr. Burton to testify regarding the cause of Harper's injuries. Dr. Burton, a forensic pathologist, testified that, based on reasonable medical probability, Harper would not have suffered quadriplegia or death if his pickup had been equipped with a head restraint to capture Harper's head and a seat belt mechanism that decreased the rebound energy. Dr. Burton determined that Harper's condition was borderline, and he asserted the following:

> So, if we decrease the force that's caused this fracture to do that stretching, then there is a reasonable probability that Mr. Harper is not a quadriplegic, that he may not have a cord injury, at all, or certainly that he would have a lesser degree of neurological deficit.

In addition to Syson's opinion on defect, Dr. Burton's opinion was based upon Harper's medical records, the smudge, results of crash tests, and medical literature.

---

**8.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours and Company, Inc. v. Robinson*, supra.

From the X rays found in Harper's medical records, Dr. Burton determined that, during the wreck, Harper suffered a flexion/compression injury and fracture at the sixth cervical vertebra level, resulting almost immediately in quadriplegia. A flexion/compression injury or "diving injury" occurs when a force is placed down the column of the neck while the head is flexed forward. Dr. Burton noted that, in addition to the flexion/compression injury, the medical records indicated that Harper had a laceration to the vertex/apex of his head, which Dr. Burton defined at trial as the highest point of the head. Dr. Burton opined that Harper hit the vertex of his head on the back window, thereby causing the smudge and placing a compressive load on Harper's spine in such a way that "it kind of collapsed the front of that vertebra, allowed the back side of the vertebra to split [and] stretched the cord."

Although there were many smudges on the back window, the smudge that appellees relied on was located in a position "kind of behind" where Harper's right ear would have been if he were sitting in the driver's seat. The smudge was made by something oily, and it contained "swipe marks." Dr. Burton testified that the smudge "at least has the characteristics of a hair swipe mark." He also stated that he did not know when the smudge was made or if it was made by Harper but that it was "located in a line where you would expect [Harper's] head to at least reasonably go in that direction as a result of the crash forces in this accident."

In order to illustrate Dr. Burton's opinion of what he thought happened to Harper in the wreck, appellees introduced a diagram containing computer-assisted drawings. The diagram showed a man, presumably similar to Harper, sitting in the driver's seat of a pickup similar to Harper's. The man's hips were rotated forward and his buttocks "a hair" forward. Dr. Burton presumed that Harper would sit in such a position in order to see down the road. Shortly after impact, Harper's pelvis "wants to start going forward." The forces acting on Harper as he moved forward were about 12 to 14 Gs. Harper's knees hit the dash, breaking his right kneecap; and then his torso loaded the belt, "maxing out the stretch" on the belt. Harper did not hit the steering wheel but came very close. Dr. Burton believed that Harper moved forward a few inches, which would put his buttocks "about six inches" from the seat back. According to Dr. Burton, Harper then rebounded back some and, with his head still flexed forward, hit the vertex of his head on the back window at the location of the smudge. Harper did not hit the window with enough force to break the window. The forces acting on Harper as he rebounded were approximately 3–4 Gs. The crash tests that were relied upon by Dr. Burton involved greater force than that in Harper's wreck. Harper's wreck admittedly involved about 44 percent less energy than the crash tests. According to an article relied on by Dr. Burton, the type of injury sustained by Harper can result from a head speed of no more than about ten feet per second, and "in some cases" the speed of an occupant's head during rebound is enough to produce an injury.

Dr. Burton testified that he "believe[d]" the injury mechanism that he described and diagramed accounted for all of the available physical evidence. He was "not sure" whether Harper's body came up off the seat cushion during rebound or whether it would have had to lift off of the seat in order to cause the injuries in this case because there was no way to reproduce the accident and the forces acting on Harper. Dr. Burton did not confirm through any study that Harper could have moved through the sequence shown in the dia-

gram or that Harper could have contacted the back window with the apex of his head in the manner that Dr. Burton suggested.

Because of the fused condition of his spine and the permanently forward position of his neck, in order for Harper to have hit the apex of his head on the back window where the smudge was located, Harper's body must have been somewhat perpendicular to the back window, and the top of his head must have been parallel to the back window. During trial, Dr. Burton admitted that, when using an X ray of Harper's fused spine to demonstrate how his head hit the back window, the X ray would have to be turned 80 or 90 degrees. There was no evidence indicating that the restraint system in Harper's pickup would have allowed Harper to hit the window at such an angle.

■ Using the factors outlined in *Merrell Dow* and *Robinson,* we hold that Dr. Burton's testimony was scientifically unreliable and, therefore, constituted no evidence of causation. Dr. Burton did not and asserted that he could not test his theory as to how Harper received the flexion/compression injury. Dr. Burton also relied on subjective interpretations, including when and how the smudge was made, where Harper was positioned as he sat in his pickup, whether or not he came up off the seat during rebound, whether or not he even needed to come up off the seat for the injury to occur, and whether or not it was even possible for Harper to have hit the back window at the angle suggested by Dr. Burton. Dr. Burton stated that rebound phenomenon is not a significant problem in the real world, and appellees brought forth no scientific evidence of other similarly caused injuries. Although the type of injury Harper suffered is generally accepted within the scientific community, the theorized cause in this case is not generally accepted and has not been subjected to peer review, publication, or testing.

### Other Causation Evidence

■ Appellees' design expert, Syson, also touched on the issue of causation, but he did not perform the occupant kinematics of Harper's wreck and did not testify that the defect caused Harper's injury. Syson testified that the dummy's head in the crash tests rebounded in a downward path and that there were no crash tests where the dummy rebounded upwards. Syson added, however, that he had seen physical evidence of an upward rebound in real accidents, but he did not elaborate or bring forward any such evidence. Nor did he cite to any publications in support of that assertion. Furthermore, the record contains no evidence that a flexion/compression injury such as Harper's has ever occurred as a result of restraint rebound.

We hold that there was no evidence of probative force to support the jury's finding on causation. Consequently, we sustain GM's third issue without reaching the factual insufficiency claim.

### This Court's Ruling

The trial court's judgment is reversed, and we render a take-nothing judgment in favor of GM.