# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-02-00483-CV

**Capital Metropolitan Transportation Authority/Central of Tennessee Railway and Navigation Company, Inc. d/b/a Longhorn Railway Company, Appellants**

**v.**

**Central of Tennessee Railway and Navigation Company, Inc. d/b/a Longhorn Railway Company/Capital Metropolitan Transportation Authority, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GN000721, HONORABLE MARGARET COOPER, JUDGE PRESIDING**

## O P I N I O N

This is an appeal following a jury trial in a breach-of-contract case. Capital Metropolitan Transportation Authority ("Capital Metro") sued Longhorn Railway Company ("Longhorn") for breach of a "Restated Contract for Rail Freight Services on the Giddings-Llano Line" ("Restated Contract"). Longhorn brought a counterclaim for breach of the same contract. At the close of Capital Metro's case, the trial court granted a directed verdict against Capital Metro on its claim for damages, other than nominal damages and attorney's fees, arising from Longhorn's breach of contract. The jury found that both Capital Metro and Longhorn breached the Restated Contract but that Longhorn's breach was excused. The jury awarded Longhorn $1.2 million in

benefit-of-the-bargain damages, $1.5 million in lost profits, and $300,000 in attorneys' fees. Capital Metro filed a motion to disregard jury answers and for judgment notwithstanding the verdict, attacking among other things, the damages found by the jury. The trial court granted Capital Metro's motion in part, determining that there was legally insufficient evidence to support the jury's finding of $1.2 million in benefit-of-the-bargain damages. The court then rendered judgment in favor of Longhorn on the $1.5 million in lost profits and the $300,000 in attorney's fees. Capital Metro appeals by five issues, claiming that there is: (1) legally and factually insufficient evidence to support the jury's findings of $1.5 million in lost profits and $300,000 in attorney's fees; (2) legally and factually insufficient evidence to support the jury's findings that Capital Metro breached the contract or that Longhorn's breach was excused; and (3) the trial court erred in granting a directed verdict in favor of Longhorn because Capital Metro raised a genuine issue of fact as to the amount of actual damages it suffered from Longhorn's breach. We will reverse the judgment of the trial court and render judgment that Longhorn take nothing.

## FACTUAL BACKGROUND

On March 15, 1996, Longhorn, a private rail carrier, entered into a contract with the City of Austin to provide rail freight and maintenance services on the Giddings-Llano rail line (the "Line"). In 1998, Capital Metro purchased the Line from the City of Austin and assumed the City's rights under the contract with Longhorn. Under the 1996 contract, Longhorn was to provide freight service to the shippers on the Line to satisfy Capital Metro's common carrier obligation. However, due to the poor condition of the Line, Longhorn's ability to satisfy the common carrier obligation and earn an additional profit was impaired. Because of the poor condition of the track, the rail cars

2

moved at a slower rate, causing productivity to suffer. In an effort to keep operations going, Longhorn made improvements to the Line at its expense.

When Capital Metro formally took title to the Line in May 1998, it hired Karen Rae to act as its general manager. Shortly thereafter, one of the bridges on the Line collapsed under the weight of one of Longhorn's cars. Ms. Rae met with Longhorn, was informed about the poor condition of the line, and was told that Longhorn was in serious financial trouble as a result of the Line's poor condition. At this point, Capital Metro hired two consultants to examine the economic viability of the freight system and its operations.

Following Capital Metro's investigation, both consultants concluded that the Line was economically viable and that Capital Metro should retain Longhorn as its operator. However, the consultants' conclusions were based on the assumption that some key changes would be made. First, a new interchange would have to be constructed to connect the Line with the Burlington Northern Santa Fe Railway. This interchange was referred to as the "McNeil Interchange" and would provide Longhorn with additional freight traffic and thus more revenue. Second, Capital Metro was told by its consultants that it was essential to use the funds budgeted in 1999 for capital improvements in order to rehabilitate the Line to a condition that would support efficient freight service.[1] Finally, a weigh scale needed to be relocated in order to provide more efficient transportation on the Line. On March 30, 1999, after several weeks of evaluation and negotiation, Capital Metro and Longhorn executed the Restated Contract and a "Mutual Release of Claims and Obligations," which

---

[1] Capital Metro had budgeted $5.55 million for capital improvements for fiscal year 1999.

incorporated revised financial arrangements, provided mutual releases of claims arising under the original contract, and incorporated new terms of the relationship.

Several months after executing the Restated Contract, Longhorn experienced financial trouble and approached Capital Metro with a request for $2.3 million in additional funds and an operating subsidy. Capital Metro denied the request, in part because the Restated Contract did not provide for this assistance.

From October 1999 to January 2000, Capital Metro sent Longhorn several notices of default under the Restated Contract. Finally, on March 8, 2000, Capital Metro sent Longhorn a notice of termination due to Longhorn's failure to cure its material defaults under the Restated Contract. Pursuant to this notice of termination, Capital Metro requested that Longhorn confirm that it would vacate the Line, but Longhorn failed to confirm that it would do so. Capital Metro sued for an injunction against Longhorn and sought damages for breach of the Restated Contract. After Capital Metro filed the suit, Capital Metro and Longhorn negotiated Longhorn's removal from the Line and Longhorn then filed its counterclaim for breach of contract against Capital Metro.

## DISCUSSION

### *Lost Profits*

In its first issue, Capital Metro argues that there is legally and factually insufficient evidence of lost profits to sustain Longhorn's award. In reviewing a no-evidence issue, we are to consider only the evidence favoring the finding, disregarding all evidence and inferences to the contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). If more than a scintilla of evidence exists, any challenges go merely to

4

the weight to be accorded the evidence. *See Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). Evidence that is mere suspicion or surmise is no evidence. *Id*. When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). The jury finding should be set aside only if the evidence is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Capital Metro argues that the trial court's judgment awarding damages for lost profits should be reversed as a matter of law. It relies on *General Devices, Inc. v. Bacon*, for the proposition that lost profit calculations *must* be based on "either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty." 888 S.W.2d 497, 502 (Tex. App.—Dallas 1994, writ denied) (quoting *D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 187 (Tex. App.—Dallas 1993, no writ)). Capital Metro argues that because Longhorn failed to present any evidence that it had a history of profitability or any evidence of identifiable future contracts on which to base its claims, Longhorn has failed to prove with reasonable certainty that it lost any profits.

Longhorn counters that Capital Metro has waived its right to challenge the sufficiency of Longhorn's expert's testimony on lost profits by failing to make a *Robinson/Havner* objection at trial. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997); *E.I. DuPont de Nemours v. Robinson*, 923 S.W.2d 549 (Tex. 1995).[2] However, Capital Metro counters that it is not

---

[2] A party must object to the reliability of scientific evidence before trial or when the evidence is offered; otherwise, the complaint is waived. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998) (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997); *E.I. DuPont de Nemours v. Robinson*, 923 S.W.2d 549 (Tex. 1995)).

challenging the *reliability* of Longhorn's expert's methodology; rather, it challenges the expert's conclusions, claiming they are not based on the facts of the case but on his own speculation and surmise. In fact, at the pretrial hearing, when discussing a motion in limine relating to the possible testimony of Longhorn's expert, Harvey Corn, Capital Metro stated that it was not challenging the reliability of Corn's testimony and in fact was relying on the reliability of his testimony.

Capital Metro argues that, because it is not challenging the reliability of the methodology of the expert, it was not required to make a *Robinson/Havner* challenge below in order to assert a no-evidence challenge on appeal. We agree. An attack on an expert opinion on the basis that it is premised on unsupported assumptions, speculation, and surmise does not constitute an attack on the reliability of the methodology of the expert. Therefore, a *Robinson/Havner* challenge is not required. *See General Motors Corp. v. Harper*, 61 S.W.3d 118, 129 (Tex. App.—Eastland 2001, no pet.) (citing *General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 591 (Tex. 1999) and *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998)).

Having decided that under the facts of this case, a *Robinson/Havner* challenge is not necessary to make a no-evidence challenge on appeal, we turn to Capital Metro's argument that the record contains legally insufficient evidence of lost profits. Capital Metro first argues that Longhorn was required to show either a history of profitability or the actual existence of future contracts in order to recover lost profits, citing *General Devices, Inc.*, 888 S.W.2d at 502. This is not an accurate statement of the law in Texas. Past profits, coupled with other facts and circumstances, *may* establish lost profits with reasonable certainty. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 505 (Tex. 2001); *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). However, lack of a profit history does not, by itself, preclude a new business from recovering

6

lost future profits. *Orchid Software, Inc. v. Prentice-Hall, Inc.*, 804 S.W.2d 208, 210-11 (Tex. App.—Austin 1991, writ denied). In *Orchid Software*, this Court stated that "precise calculation of anticipated profits has never been essential to recovery by any business. It is sufficient if there is data from which the loss may be ascertained with reasonable certainty." *Id.*

The supreme court has consistently held that in order to recover lost profits, the loss amount must be shown by competent evidence with reasonable certainty. *Helena Chem.*, 47 S.W.3d at 505; *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *Teletron Energy Mgmt.*, 877 S.W.2d at 279; *Holt Atherton Indus.*, 835 S.W.2d at 84; *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098-99 (Tex. 1938); *see also Orchid Software*, 804 S.W.2d at 211. The test is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise. *Teletron Energy Mgmt.*, 877 S.W.2d at 279. What constitutes reasonably certain evidence of lost profits is a fact-intensive determination. *Id.* However, the injured party must do more than show that it suffered some lost profits. *Szczepanik*, 883 S.W.2d at 649. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Id.*

Capital Metro argues that Longhorn failed to present any objective data from which lost profits could be determined with reasonable certainty. The only testimony offered at trial regarding lost profits came from Longhorn's expert, Harvey Corn. Capital Metro's complaint on appeal is that Corn's conclusions regarding lost profits were based on unfounded assumptions rather than objective facts, figures, or historical profitability.

In determining what Longhorn's lost profits would be had the contract continued, Corn analyzed historical revenues and expenses associated with the operation of the Line, as well

7

as information provided by Longhorn, to arrive at an annual net profit figure. He then incorporated a rate of growth over the life of the Restated Contract and discounted profits back to present value. His projections involved three basic categories: (1) an estimate of how many "carloads" Longhorn would move if the Line were in optimal condition and all capital improvements were made; (2) an estimate of how much Longhorn could charge per carload; and (3) a projection of how much it would cost for Longhorn to operate. In order to make the necessary calculations, Corn relied heavily upon the two reports generated by Capital Metro's experts—Zeta-Tech and R.L. Banks—in addition to consultations with Longhorn's owner, Don Cheatham.

The two reports relied on by Corn provided a financial history of the railroad, dating back to 1989 and continuing through 1998. Zeta-Tech noted that the previous operator of the Line had experienced 8000 annual carload volumes for several years in the late 1980s and early 1990s. R.L. Banks's report noted that the annual carload volume had been as high as 9791 in the 1990s. Based on the historical data generated by these reports, Corn concluded that the approximate number of carloads Longhorn could expect if the "track were maintained to the right class and maintenance was done and the trains could move at the right speed over the right sections of the track, and connect with all the right interchanges" would be 7550 per year.[3]

In order to determine a gross revenue figure, Corn estimated that Longhorn could anticipate average revenue of approximately $440 per carload. This amount is slightly higher than the Zeta-Tech estimate of $409 per carload, in part because, according to Capital Metro's rail manager, had the McNeil exchange been completed, substantially higher revenue per car would have

---

[3] Corn also based his estimate of 7550 carloads per year on the assertion of Don Cheatham that he thought he should be able to get 7550 carloads during 1999 from existing shippers.

8

resulted. Again, Corn based this number on information gathered from Longhorn, historical records, and Zeta-Tech's report. Corn then assumed that if improvements were made to the Line, Longhorn would attract new customers, resulting in an additional 500 car loads per year and yielding Longhorn a total annual revenue of $3,569,740.[4]

Finally, to arrive at a net-profit figure, Corn needed to deduct estimated expenses. Corn calculated expenses by using Longhorn's actual historical operating expenses. Corn, as well as Zeta-Tech and R.L. Banks, concluded that it cost approximately $2.66 million per year to run the business. He then estimated Longhorn's maintenance expense by averaging the estimates of Zeta-Tech and R.L. Banks for maintenance and capital expenditures and attributing half to Longhorn for maintenance and half to Capital Metro for capital expenditures, resulting in an annual maintenance amount of $427,500.[5] This resulted in an annual net income figure for Longhorn of $485,619. Corn then escalated this net income by a 5 percent growth rate over the life of the Restated Contract through the year 2016, and brought the aggregate future income stream back to present value at a discount rate of 28 percent. Using this analysis, Corn concluded that Longhorn's lost profits were approximately $6.6 million.

---

[4] Corn cross-referenced this figure with the historical data on the Line. Specifically, he reviewed the information contained in the R.L. Banks report regarding the operation of Austin and Northwestern Railway (AUNW), Longhorn's predecessor for the years 1989 through 1995. A present value analysis revealed that AUNW generated an average of $3.86 million in revenue from 1989 through 1993, the years for which complete financials were available for operations of the Line.

[5] The Restated Contract obligated Capital Metro to pay for 100 percent of the maintenance expenses for the first two years, however, Corn deducted 50 percent of these costs from Longhorn's gross revenue.

Because Capital Metro does not dispute the validity of Corn's methodology, we turn to its argument that Corn's assumptions were based on mere speculation and surmise rather than on the facts of the case. Opinions on lost profits must be based on objective facts, figures, or data from which an amount may be ascertained with reasonable certainty. *Szczerpanik*, 883 S.W.2d at 649. Evidence that is without any factual foundation is purely speculative and conclusory. *Id.* The "reasonable certainty" test is not without parameters. *SBC Operations, Inc. v. Business Equation, Inc.*, 75 S.W.3d 462, 467 (Tex. App.—San Antonio 2001, pet. denied) (citing *Teletron Energy Mgmt.*, 877 S.W.2d at 279). Profits that are largely speculative, such as those from an activity that is dependent on uncertain or changing market conditions, or on uncertain business opportunities, cannot be recovered. *Id.* Factors like these and others that make a business venture risky in prospect preclude recovery of lost profits in retrospect. *Id.*

It is undisputed that Longhorn had a history of losses and had never made a profit on its operations. Corn admitted that there were no identifiable contracts on which he based his forecasts of future business. The financial data Corn relied on for his conclusions predated the 1999 Restated Contract and "had no relevance whatsoever" to Longhorn's financial performance in 1999 and subsequent years.[6] In arriving at the $6.6 million in lost profits, Corn takes the Restated Contract out to the year 2016, assuming that the renewal features would be exercised.

Corn's conclusion that Longhorn could move 7550 carloads on the Line was based on Cheatham's assertion that Longhorn could have moved 7550 carloads with its existing shippers, assuming the Line had always been maintained and capital improvements had been made. Corn was

---

[6] The financial records showing the operating expenses and revenues incurred by Longhorn were based on the original contract between Capital Metro and Longhorn, not the Restated Contract.

also directed to assume that if Longhorn could not do that, it was Capital Metro's fault. However, Corn did not engage in any independent determination of what the actual carloads were for each of the existing shippers nor did he inquire into the reasonableness or reliability of the individual numbers he was given by Cheatham. In fact, Corn did not even check to see if Longhorn was capable of moving this many carloads. He took the number Cheatham gave him and considered Zeta-Tech's and R.L. Banks's reports, which indicated that *a rail freight provider* could *hypothetically* move between 6,000 and 8,000 cars per year. He did not make any independent determination as to whether it was reasonable to expect *Longhorn* to move 7550 cars per year. He did not inquire into Longhorn's management practices or any other factor that might affect Longhorn's capability of moving 7550 cars per year. Corn admitted that he did not know whether it was reasonable to conclude that Longhorn could get to that point in 1999 or any other year. Further, he did not independently verify whether $400 per car revenue was a reasonable expectation for Longhorn, nor did he have any idea where the additional 500 cars per year would come from or who the shippers would be.

The historical data Corn relied on in R.L. Banks's report showed that the operator of the Line in 1989 through 1993 made a profit. However, when Longhorn took over, it lost money every single year that it operated the Line. Again, Corn did no independent investigation into Longhorn's business and management practices, whether it had a business plan showing it was capable of operating at a profit, or whether other factors might have caused it to lose money. In addition, Corn acknowledged that Longhorn historically had variable operating costs of approximately 160 percent of its gross revenues. Further, Corn does not know what Longhorn currently spends on maintenance. He merely estimates $427,500 per year. However, this number

11

is derived from Zeta-Tech's estimate of $9,000 per mile of Line per year for both capital expenditure and maintenance. Since that number does not differentiate between maintenance and capital expenditure, Corn makes the unfounded assumption that fifty percent is attributable to maintenance and fifty percent to capital expenditures.[7]

In sum, Corn's testimony and the data he based it on fall short of the legal requirement that lost profits be proven by competent evidence with reasonable certainty. Corn acknowledged that Longhorn lost money every year it operated the rail line. There were no contracts to support the increased revenue Corn claims Longhorn would have going forward. Corn's testimony as to how he arrived at an estimate of the number of carloads Longhorn could move, how much Longhorn could charge per carload, and a projection of how much it would cost for Longhorn to operate are all based on unfounded assumptions. Therefore, Longhorn has failed to establish lost profits as a matter of law.

Longhorn claims that its existence was predicated entirely upon the existence of its contract with Capital Metro and cites to *Pace Corp. v. Jackson*, 284 S.W.2d 340, 343 (Tex. 1955), for the proposition that recovery of lost profits is allowed where a business is established on the strength of a contract but is discontinued because of its breach. Longhorn claims that, because it was Capital Metro's breach that prevented it from operating profitably under the Restated Contract, Capital Metro cannot now rely on the absence of a history of profits. We disagree.

---

[7] It is noteworthy that, in arriving at the $6.6 million of lost profits, Corn did not take into account the fact that Longhorn had approximately $2.5 million in past due accounts payable or any plan of how Longhorn was going to pay that debt. He makes the assumption that the $2.5 million in debt does not even exist.

Cheatham purchased and was operating the Central of Tennessee Railway and Navigation Company ("Central Tennessee") for several years when he entered into a contract with Capital Metro to operate the Line in Austin, commencing in March 1996. Central Tennessee registered the assumed name "Longhorn Railway" and began doing business under that name shortly thereafter. Under the 1996 contract, Longhorn was to provide freight service on the Line to satisfy Capital Metro's common carrier obligation. Due to the poor condition of the Line and Longhorn's financial trouble, Capital Metro hired two expert consulting firms to gauge the economic viability of the freight system and its operations. Based on the conclusions of Capital Metro's experts, Capital Metro and Longhorn entered into the Restated Contract on March 30, 1999. It is this contract that Capital Metro allegedly breached. However, Central Tennessee had been in business for several years before Longhorn was created in 1996 and it was the original contract that Longhorn's operations were established on, not the Restated Contract of 1999. *Pace* is inapplicable under these facts. Longhorn was neither an unestablished business nor was it a business that was established on the basis of the Restated Contract. In any event, Corn's analysis fails. His testimony does not provide a basis upon which to assert lost profits. We sustain Capital Metro's first issue that the evidence is legally insufficient to support the award of lost profits of $1.5 million.

### *Attorney's Fees*

In its third issue, Capital Metro claims there is legally and factually insufficient evidence to support the award of attorney's fees to Longhorn. Section 38.001(8) of the civil practices and remedies code provides that a party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . .

13

an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 1997). To recover attorney's fees under this section , a party must (1) prevail on the cause of action for which attorney's fees are recoverable and (2) recover damages. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); *State Farm Life Ins. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995); *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 684 (Tex. App.—Austin 2002, no pet.). Because we have held that Longhorn is not entitled to lost profits, it has recovered zero damages, precluding any award of attorney's fees. *Solis*, 951 S.W.2d at 390. Therefore, we sustain the third issue on appeal.

### *Directed Verdict in Favor of Longhorn*

In its fifth issue, Capital Metro argues that the trial court erred in granting a directed verdict in favor of Longhorn as to the amount of damages Capital Metro suffered from Longhorn's breach of the Restated Contract. At trial, the court sustained Longhorn's motion in limine regarding Capital Metro's evidence of damages on the basis that they were not timely disclosed to Longhorn. The trial court then granted a directed verdict against Capital Metro on the issue of its contract damages.

The trial court's failure to admit evidence is reviewed for an abuse of discretion. *See Reliable Consultants, Inc., v. Jaquez*, 25 S.W.3d 336, 345 (Tex. App.—Austin 2000, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We may reverse a trial court's judgment based on an error in the admission or exclusion of evidence only if we conclude that (1) the trial court did in fact commit error and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a);

14

*Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). If a party does not timely make, amend, or supplement a discovery response, trial courts are to exclude evidence relevant to that inadequate or inaccurate response unless the failure to make, amend, or supplement the discovery response timely will not unfairly surprise or unfairly prejudice the other parties. *See* Tex. R. Civ. P. 193.6(a)(2). An examination of the record reveals that the information pertaining to the evidence excluded by the trial court had been disclosed by Capital Metro only days before trial. A finding of unfair surprise or prejudice is implicit in the court's ruling. Capital Metro has failed to demonstrate where or how the trial court has abused its discretion in excluding evidence that was not timely disclosed in discovery. We overrule Capital Metro's fifth issue.

### *Longhorn's Cross-Issues*

In its first cross-issue, Longhorn claims that the trial court erred by granting, in part, Capital Metro's motion for judgment notwithstanding the verdict when it concluded that there was no evidence to support the jury's finding that Longhorn suffered $1.2 million in damages relating to the impaired value of the Restated Contract. The trial court disregarded the jury's answer to that portion of question five of the jury charge, which asked the jury to find "the difference, if any, between the value of the Restated Contract agreed to by the parties and the value of the performance by [Capital Metro]. The difference in value, if any, shall be determined at the time and place the Restated Contract was to be performed." In response, the jury answered "$1.2 million." In granting that part of Capital Metro's motion, the trial court concluded that there was legally insufficient evidence to support the jury answer or to raise that issue of fact.

15

In order to prevail on this question, Longhorn was required to present evidence of the value of the Restated Contract agreed to by the parties and the value of the performance by Capital Metro. It did neither. The only evidence regarding damages that Longhorn presented related to its claim for lost profits, which is insufficient to support a finding on its "benefit of the bargain" question. We overrule Longhorn's first cross-issue.

In its second cross-issue, Longhorn claims the trial court erred in refusing to submit a question to the jury on the amount of operating losses suffered by Longhorn as a result of Capital Metro's breach. The only evidence Longhorn points to in support of this argument is (1) a letter from Longhorn claiming it was losing $138,877.58 per month; (2) evidence showing that Longhorn had over $2.8 million in accounts payable as of December 31, 1999; and (3) Corn's testimony regarding Longhorn's lost profits and his opinion regarding the "value of the company." It is undisputed that Longhorn lost money every month, both before and after the Restated Contract. However, Longhorn did not present any evidence to show what portion, if any, of its operating losses was attributable to a breach by Capital Metro. We overrule Longhorn's second cross-issue.

### Capital Metro's Breach of Contract

In its second and fourth issues, Capital Metro argues that there is legally and factually insufficient evidence that it breached the Restated Contract; thus, there is legally and factually insufficient evidence that Longhorn's breach was excused. Having decided that Longhorn is not entitled to lost profits and holding that it take nothing, we need not reach the issue of whether Capital Metro breached the Restated Contract. Further, because we have overruled Capital Metro's issue regarding the exclusion of evidence pertaining to its damages caused by Longhorn's breach, we have

16

rendered moot the question of whether Longhorn's breach has been excused. Therefore, we decline to address Capital Metro's issues two and four on these points.

## CONCLUSION

We hold the evidence is legally insufficient to support the award of $1.5 million in lost profits and overrule Longhorn's cross-issues on other damages. Further, because Longhorn has not recovered damages, it is not entitled to recover attorney's fees. Finally, we overrule Capital Metro's other issues on appeal. We reverse the judgment of the trial court and render judgment that Longhorn take nothing.

_____

David Puryear, Justice

Justices B. A. Smith, Puryear and Aboussie[*]

Reversed and Rendered

Filed:   July 11, 2003

---

[*]   Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).