# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00527-CV

**Ray D. Robertson, Inc. d/b/a Custom Sand & Gravel; and R. D. Robertson, Individually, Appellants**

**v.**

**James B. Morin and Curry & Morin, LLP, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. D-1-GN-06-001415, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

R. D. Robertson and his wholly-owned company, Ray Robertson, Inc., d/b/a Custom Sand & Gravel (Robertson) appeals a no-evidence summary judgment on claims he asserts against his former legal counsel, appellees James B. ("Brad") Morin and Curry & Morin, L.L.P. Appellees' summary-judgment motion challenged the elements of causation and damages. In two issues, Robertson asserts that the district court abused its discretion in excluding the affidavit of his damages expert and erred in holding that his remaining summary-judgment evidence failed to raise a genuine issue of material fact. We will affirm the district court's judgment.

Robertson is based in Marshall, Texas. He presented summary-judgment evidence that, at relevant times, he was engaged in the business of acquiring and leasing sand and gravel quarries and the mining and processing of sand and gravel. His company's financial and tax statements in evidence reflected total assets of approximately $400,000 as of August 1998, of

which $3,600 was cash, and annual net income that ranged between roughly $2,200 and $7,000 between 1995 and 1998. Robertson acknowledged having a "bad" credit rating. On the other hand, Robertson also presented evidence that he qualified for the potentially advantageous minority-owned or "disadvantaged" business contracting status with various governmental entities, including the City of Austin and the Texas Department of Transportation.

In May 1999, Robertson entered into an earnest money contract to purchase an 819-acre parcel of land in Webberville, in eastern Travis County, that had been shown to have rich gravel reserves. Robertson contemplated that he would mine the gravel and sell it to Austin-area contractors. The agreed-upon purchase price was $4 million. As Robertson admitted below, "[b]ecause of a poor credit rating, which was well-known to all the participants, [he] was unable to purchase the property without assistance." He engaged a firm, Bonding & Technical Services (BTS), operated by Sheri Aaron and Dick Davis, to assist him in developing a business plan and obtaining funding for the Webberville property purchase and start-up costs. BTS provided the initial $25,000 earnest money to hold the option. Robertson also assigned the earnest-money contract to BTS and gave Aaron a power of attorney.

Robertson and BTS devised a "business plan" for use in recruiting investors. The plan's "project summary" stated that Robertson was seeking a total of $8,550,000 in financing, $4 million of which was to cover the land purchase, and the remainder to cover start-up costs.[1] The

---

[1] These costs included: "Materials processing plant and associated mining equipment," $2,500,000; "Shop and office building," $250,000; "Materials hauling trucks," $1,000,000; and "Interim working capital" to cover the costs of "mobiliz[ing] all equipment and [beginning] operations of the new pit, estimated to take approximately 90 days," $800,000.

2

plan further elaborated that "Mr. Robertson has programmed a mining operation that will utilize a dragline, conveyors and a plant to produce an estimated 500 tons of sand and gravel per hour." Other portions of the plan referred to anticipated purchases of heavy equipment including front-end loaders, a bulldozer, water pumps, a screening plant with "cone crusher," and the drag line.

The summary-judgment record reflects that closing was repeatedly postponed or extended over a period of months as BTS unsuccessfully attempted to obtain financing for Robertson. BTS initially approached commercial banks before ultimately turning to offshore sources. Ultimately, however, the earnest-money contract expired without BTS obtaining the funding.

Thereafter, Robertson hired Morin and his firm—who had previously represented him in some domestic relations matters—on a contingency-fee basis to represent him in seeking damages he attributed to BTS's failure to obtain financing for the Webberville venture. In March 2001, Morin, on Robertson's behalf, filed suit against BTS, Aaron, Davis, and other defendants in Harrison County district court (the "Underlying Suit"). In mid-August 2001, venue was transferred to Travis County. Robertson, through Morin, pled contractual theories, negligence, and breach of fiduciary duties. He alleged injury in the form of "loss of the business opportunity to purchase the subject property which would have fulfilled his business plan," and that he incurred damages of "loss of income in an amount not to exceed $90,000,000." BTS, Aaron, and Davis counterclaimed, seeking reimbursement of approximately $500,000 in out-of-pocket expenses they allegedly incurred while assisting Robertson.

3

The Underlying Suit was set for trial in March 2004. In a letter dated November 19, 2003, Robertson accused Morin of various inadequacies in his representation, and fired him.[2] Appellees deny the assertions in Robertson's letter, claiming that Robertson had never previously voiced dissatisfaction with the legal services he was receiving, and suggesting that the letter was mere "generalized boilerplate" unsupported by the facts. Appellees further contend that discovery in the Underlying Suit revealed that the facts were significantly different and much less favorable than Robertson had initially represented to Morin before Morin agreed to take the case.

In response to Robertson's letter, Morin filed a motion to withdraw, which was eventually granted by the district court. Thereafter, Robertson was apparently unable to retain replacement counsel. Robertson blames Morin for this, asserting that Morin "held the file hostage"

---

[2] The letter read, in relevant part:

During the course of our relationship, I have not been kept informed of significant developments, I have been misinformed about the status of my case, and my interests have not been protected. Generally, my telephone calls are not promptly returned or they are not returned at all. Based on the information in my personal file, you have not conducted any meaningful discovery concerning the merit of my claims or the other sides defenses. You have failed to contact or interview critical witness [sic] that I have identified and made available to you. Despite my multiple requests, no one in your firm has informed me of a plan of action or strategy to protect my interests and develop my claims. As a result, I can not make informed decisions about the progress of your representations or lack thereof. Frankly, I have no idea what you are doing to protect my interests.

Please take appropriate actions to protect my interests in the pending case until I secure other counsel. Within 7 days of your receipt of this letter, please send me my complete file in usable form. The file should contain all information generated before and after suit was filed, including but not limited to, all information supplied to you by me, all information produced by third parties, and all information that you have identified or secured from any source concerning your representation of me. Please also send me an itemized accounting of expenses.

and that he could not find another attorney willing to take his case on a contingency basis without first reviewing the file. Appellees claim that Morin made multiple inquires with Robertson as to where he should forward the file, but never received a response.

Robertson continued to pursue the suit pro se. He unsuccessfully moved for a continuance on the eve of trial. After this motion was denied, Robertson settled the Underlying Suit for $6,000.

On April 24, 2006, Robertson, with new counsel, sued appellees, asserting claims for professional negligence and breach of fiduciary duty. As to both theories, Robertson sought to recover as damages the value of the recovery he claimed he would have obtained in the Underlying Suit absent appellees' breaches of duties. After discovery, appellees filed a no-evidence motion for summary judgment challenging the causation and damages elements of Robertson's claims. Specifically, appellees challenged whether Robertson could produce evidence that he could have recovered any of the damages he had sought in the Underlying Suit—lost profits he claimed he would have earned had he been able to purchase the Webberville property.

Robertson filed a response to appellees' motion with evidence. Much of the response addressed whether appellees had breached their duties to Robertson, elements that were not challenged by the motion. Regarding the damages issue, Robertson referred solely to an affidavit prepared by Gilbert Herrera, his damages expert. Appellees objected to Herrera's affidavit on grounds that it contained damages opinions that were not reliable, that it contained statements of fact that were not shown to be based on Herrera's personal knowledge, and that it contained opinions regarding Morin's conduct as a lawyer in the Underlying Suit that Herrera was not qualified to give.

5

Following a hearing, the district court sustained appellees' objections to Herrera's affidavit, granted appellees' summary-judgment motion, and rendered judgment that Robertson take nothing on his claims against appellees.[3] This appeal followed.

In his second issue, Robertson urges that the district court abused its discretion in excluding Herrera's damages opinions as unreliable. Robertson does not challenge the district court's rulings sustaining appellees' other objections.

A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). If a party opposes and objects to the admission of expert testimony, the proponent bears the burden of demonstrating its admissibility. *Id.* at 557.

Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Wilkins*, 47 S.W.3d at 499; *Robinson*, 923 S.W.2d at 556; *see also* Tex. R. Evid. 702. Expert testimony is also unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 727 (Tex. 1998) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

---

[3] The judgment also reflects that the district court struck a supplemental affidavit from Herrera that Robertson had filed following the hearing. Robertson does not complain of this ruling on appeal.

Factors used by courts to determine whether expert testimony is reliable include:

1.  the extent to which the theory has been or can be tested;

2.  the extent to which the technique relies upon the subjective interpretation of the expert;

3.  whether the theory has been subjected to peer review and/or publication;

4.  the technique's potential rate of error;

5.  whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

6.   the non-judicial uses which have been made of the theory or technique.

*Robinson*, 923 S.W.2d at 557.  These factors are non-exclusive and flexible. *Id.*

A trial court has no discretion to admit an expert's opinion when the opinion is based on nothing more than the expert's experience.  *Gammill*, 972 S.W.2d at 726.  A conclusion is not so simply because an expert says it is so.  *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997).  When the expert "brings to court little more than his credentials and a subjective opinion," this is not evidence that would support a judgment.  *Id.* (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421-22 (5th Cir. 1987)).

Herrera presented, and the district court excluded, essentially two sets of opinions going to the issue of whether Robertson could have proven lost-profits damages in the Underlying Suit:  (1) opinions concerning the likelihood that Robertson would have secured the financing necessary to purchase the Webberville property and execute his business plan absent the alleged

7

wrongdoing of BTS, Aaron and Davis; and (2) assuming Robertson had obtained the financing, opinions concerning the income the operations would have earned:

16. As summarized in Exhibit II, I reviewed a number of documents in this matter. Based on the documents reviewed, it is my professional opinion that the Project and the Project's business plan should have resulted in financing sufficient to purchase the Webberville Property and fund the sand and gravel development plans. Tests by Capitol Aggregates and Trinity Engineering Testing Corporation on the Webberville Property estimated gross recoverable reserves of sand and gravel materials between 24,699,000 and 30,000,000 tons. Importantly, the LOIs negotiated by RDR/Robertson guaranteed a continuous stream of revenue. The LOIs substantially mitigated many of the operational and financial risks evident in the Project. The Project's business plan assumption of $4,500,000 to fund the sand and gravel development plans was in-line with market costs at the time. The other operating assumptions were reasonable and consistent with market conditions.

17. As summarized in Exhibit III, utilizing the Project's business plan, I calculated the Project's expected net present value ("NPV") and internal rate of return ("IRR") through a discounted cash flow approach ("DCF"). Taking into account the Project's business plan, I also incorporated my building product industry experience as well as available industry market data. Utilizing an 18% discount rate, I calculated a range of NPV for the Project between $18,800,000 and $26,600,000 and a range of IRR between 36% and 51%. Based on my review of the Project, RDR/Robertson would have retained between 35% and 50% of the equity value of the Project. I calculated that in addition to a reasonable salary, RDR/Robertson would have realized between $6,600,000 and $13,300,000 in NPV of the Project.

18. Financing in the Project involved a degree of risk, as discussed below. The proposed financing required a sophisticated financial institution with the capacity to properly assess risk versus reward. An experienced investment banking firm ("I-Bank") with appropriate knowledge of the real estate and construction sand and gravel market would have approached Private Equity Firms ("PE Firms") and Angel Investors ("AIs") with a specific appetite for real estate and project financings. PE firms and AIs are investors, not lenders. They typically invest in projects with high projected returns. Real estate and development projects that are not candidates for traditional bank financing often turn to PE Firms and AIs. Additionally, while management

8

involvement is often important to PE Firms and AIs they often have extensive industry experience and do not require personal guarantees.

19. Given the developmental nature of the Project, an experienced I-Bank would have focused on identifying PE Firms and AIs interested in Seed, Start-up and Early-Stage financing.[4] Private equity is a term often used to identify an investment in a company that is not publicly traded or listed in a stock exchange (i.e., "private"). Private equity is generally regarded as an investment which offers investors the opportunities to achieve superior long-term returns compared to traditional investments. Private equity offers long-term, high returns which represent a premium to the performance of public equities. Private equity professionals are highly skilled. The returns realized are the result of the investment risk private equity investors assume. Private equity risk is often moderated through portfolio diversification which consists of various stages of investments in a broad range of industries. In my view, the Project and its strategic presence in the construction sand and gravel industries would have complemented the diversification strategy of most private equity portfolios.

20. Aside from managing risk through portfolio diversification, PE Firms and AIs also measure the level of interest in investing in a particular business based on rate of return benchmarks. The rate of return is most often measured through an IRR. Between 1990 and 2005, private equity investments averaged a 14.5% annual return versus an 11.3% annual return from the S&P 500. The 14.5% return represents an IRR benchmark from which PE Firms and AIs weigh an investment. From a return perspective, it is important to realize that an investment in the Project, with limited operating history and development characteristics is more risky than an established enterprise. Accordingly, PE Firms and AIs would have added a premium of between 5% and 10% to the 14.5% IRR benchmark. In my view, PE Firms and AIs would have invested in the purchase of the Webberville Property and the line of credit for the development of the sand and gravel deposits when the Project's IRR exceeded 25%. The Project's IRR was estimated to be between 36% and 51%.

---

[4] Herrera elaborated, "Seed Financing is financing for the development of a business concept, Start-Up Financing is a financing provided to companies for the use in development and marketing and Early-Stage Financing is financing provided to companies that have completed the product development stage and require funds to initiate manufacturing and sales."

21. PE Firm[s] and AIs often invest in exchange for ownership control (i.e., they receive 50% or more of ownership). Ownership control is a key feature realized in return for the use of funds provided and risks undertaken in the investment. In my experience, ownership control ranges from 50% to 65% of the equity, depending on the specific investment. Based on my review of the Project and the projected IRR, RDR/Robertson would have retained between 35% and 50% of the equity value of the Project in exchange for the $8,500,0000 to purchase the Webberville Property and fund the sand and gravel development plans, in addition to a reasonable level of compensation, RDR/Robertson would have realized between $6,600,00 and $13,300,000 in NPV of the Project. In my professional opinion the Project and the Project's business plan should have resulted in financing sufficient to purchase the Webberville property and fund the sand and gravel development plans.[5]

Appellees contend that Herrera's opinions that Robertson would have obtained the financing necessary to purchase the Webberville property and execute his business plan were unsupported, unreliable, and the mere *ipse dixit* of the expert. We agree. To the extent that Herrera identifies any bases for his opinion that Robertson would have obtained financing, he relies heavily on "letters of intent" that supposedly "guaranteed a continuous stream of revenue" and "substantially mitigated many of the operational and financial risks evident in the Project." Herrera apparently refers to two letters in the record, one written by a representative of Trinity Materials, Inc., on March 31, 1999, and the other by a representative of Rainbow Materials, Inc., on April 20,

---

[5] In addition to the foregoing paragraphs of Herrera's affidavit, the district court also sustained appellees' reliability objection to the following paragraph regarding the general purposes of awarding damages in civil cases:

15. The express purpose of determining damages in a litigation matter is to compensate the aggrieved party for the loss(es) suffered directly or sustained consequentially as a result of the actions or conduct of the offending party or parties. The methodology of calculating damages requires a reasonable comparison utilizing a "but for" analysis, i.e., the value in the absence of the alleged damage and/or conduct.

10

1999. Contrary to Herrera's assumptions, these letters do not purport to "guarantee" anything except that the two companies would "consider" or be interested in further negotiations regarding the purchase of some unspecified amount of materials from Robertson, provided the materials met specifications and were offered at an acceptable price.[6]

Herrera also predicates his financing opinions on projections stated in the "business plan" that Robertson and BTS had prepared as a tool for recruiting investors. Beyond a passing statement that the plan's "operating assumptions are reasonable and consistent with market conditions"—which he never explains—Herrera does not indicate why it would be reasonable for an expert in his field to accept those projections at face value. *See* Tex. R. Evid. 703; *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007). Similarly, Herrera provides no analysis regarding why he should accept the business plan's assumptions that $4.5 million would be the amount of financing required to execute the business plan, other than an unexplained reference to "market costs at the time."

---

[6] The Trinity Materials letter indicated that the company "would be very much interested in marketing the product of Concrete Aggregate and possibly Asphalt Aggregate of which you are proposing to produce in the Austin area . . . providing the price is competitive ($3.00 to $3.75 per ton) in spec and available." The Rainbow Materials letter merely "confirm[ed] Rainbow Material's commitment to considering the use of crushed stone for concrete from your proposed facility on IH-35." Although the writer continued, "I am sure that Rainbow Materials will purchase aggregate from your facility for producing concrete," this assertion is qualified: "provided the material at your facility meets the current specifications for use of aggregate in a specific application as well as being economically competitive for Rainbow to use your material." The writer concluded, "Rainbow Materials, Inc. will welcome the opportunity to consider alternative sources of materials for their operations, especially limestone based products for the Austin and San Marcos markets." Although each letter cited the company's total annual demand for concrete materials, neither indicated any particular amount that the company would purchase or be willing to purchase from Robertson, the price, or any other material term.

11

Herrera likewise fails to cite any objective bases or methodology to support his opinion that the project would lure investors if it had an internal rate of return exceeding 25 percent. Further, he wholly fails to address whether or how the availability of financing would be impacted by Robertson's poor credit history, lack of capital, or the fact that the scale of the project he envisioned dwarfed Robertson's previous enterprise. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 911-12 (Tex. 2004) (failure to address key factor in causation analysis was, "by itself, nearly fatal").

This ruling is likewise fatal to Herrera's opinions concerning the viability of Robertson's proposed enterprise and the profits it would have earned, as those opinions assumed that Robertson could have purchased the Webberville property and funded the enterprise in the first place. Even leaving this flaw aside, Herrera's lost-profits opinions are unreliable. To recover lost profits, by whatever method calculated, "the amount of the loss must be shown by competent evidence with reasonable certainty." *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 884 (Tex. App.—Austin 2006, pet. granted, remanded by agr.) (quoting *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098 (Tex. 1938)). Determining whether evidence of lost profits is reasonably certain requires a fact-intensive inquiry based on objective facts, figures, or data. *Texas Instruments v. Teletron Energy Management*, 877 S.W.2d 276, 278-80 (Tex. 1994); *Capital Metro. Transp. Auth. v. Central of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 579 (Tex. App.—Austin 2003, pet. denied). As with his opinions regarding financing, Herrera predicates his lost-profits opinions on projections stated in Robertson's business plan, yet never explains why it is reasonable to do so. Nor does Herrera explain why it was reasonable to rely on his own "business

12

and project industry experience" when his resume, attached to his affidavit, indicates no experience with the construction sand or gravel industry.

Herrera's affidavit offers no objective facts, sets out no methods, and presents no explanation as to how he arrived at his various conclusions. In the absence of any underlying principles, methods, or objective data, Herrera's opinions are based on nothing more than his own qualifications. Without any principles, methods, or objective data with which to review the reliability of Herrera's conclusions, the district court acted within its discretion in excluding Herrera's opinions. *See Gammill*, 972 S.W.2d at 726; *Havner*, 953 S.W.2d at 712. Accordingly, we overrule Robertson's second issue.

In his first issue, Robertson urges that the district court erred in granting appellees' no-evidence summary-judgment motion. We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the non-movant fails to produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Perdue*

13

*v. Patten Corp.*, 142 S.W.3d 596, 603 (Tex. App.—Austin 2004, no pet.). Consequently, a no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch*, 118 S.W.3d at 751. We view the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Id.* (citing *Havner*, 953 S.W.2d at 711). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id.* "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In his response to appellees' motion, as noted, Robertson cited solely to Herrera's affidavit in arguing that his summary-judgment proof raised a fact issue as to damages. On appeal, Robertson urges us to consider other summary-judgment evidence that, he now contends, was legally sufficient to support lost-profits damages. Even assuming Robertson preserved error as to these contentions, *see McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339-41 (Tex. 1993), the evidence to which he now refers fails to present a fact issue as to damages.

Robertson relies on the deposition testimony of Thomas Glendenning, a real estate developer, as proof that he would have obtained financing absent the alleged wrongdoing of BTS, Aaron, and Davis. Glendenning testified that he had contemplated purchasing the Webberville property himself, possibly leasing it to Robertson to mine for gravel in exchange for a royalty

14

payment, with an eye to eventually developing the property for other uses after the gravel was depleted.[7] Glendenning denied, however, that he would have loaned Robertson funds to purchase the land—and testified that he had rejected such a proposal from Robertson out-of-hand. Glendenning added that he was unaware of Robertson's credit history and would have performed due diligence concerning such matters before entering into a lease or other business arrangement with him. In this context, Glendenning also testified that, in his view, the project was "financeable," explaining that "I certainly wouldn't go forward with it unless I thought it was possible, and I have good success on having all of my other projects financed." However, Glendenning did not purport to offer an opinion as to whether he thought Robertson could have obtained financing, or for any particular enterprise Robertson hoped to conduct there if Robertson purchased the property. Nor was Glendenning designated as an expert as to the availability of financing. His testimony is no evidence that Robertson would have obtained financing for his venture.

Robertson also attempts to rely on his own "business plan" as evidence both that he would have obtained financing and earned profits. He emphasizes the length of the document, which exceeds 180 pages, counting attachments. The document does refer to objective engineering data indicating that the Webberville property contained large quantities of gravel, as well as indicia that there exists a market for sand and gravel in the Austin area. However, while it purports to project Robertson's revenue and expenses from operations on the Webberville property, these projections are predicated upon the same sort of unsupported assumptions that were fatal to Herrera's affidavit; e.g., that Robertson "currently holds letters of intent, verbal agreements, and written contracts to

---

[7] Glendenning explained that a gravel lease is similar to an oil and gas lease.

15

provide 100,000 tons of materials per month" that will "guarantee more than $800,000 of revenue monthly."[8] Robertson's projections are unsupported by objective data. "The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits." *Texas Instruments*, 877 S.W.2d at 280. The business plan is no evidence of lost profits. *See id.* at 278-81. We overrule Robertson's first issue.

   Having overruled both of Robertson's issues, we affirm the district court's judgment.

_____

   Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: August 27, 2009

---

[8] In addition to the previously discussed letters of intent, there are some materials supply contracts attached to the plan to which Robertson is a party, but these concern operations in other areas of the state.