

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00041-CV

_____

SEITEL DATA, LTD., Appellant

V.

RALPH SIMMONS, AS TRUSTEE OF RALPH SIMMONS
AND LAURA ANGELA SIMMONS FAMILY LIVING TRUST, Appellee

On Appeal from the 273rd Judicial District Court
Shelby County, Texas
Trial Court No. 10CV31,035

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Seitel Data, Ltd., entered into a contract with the Ralph Simmons and Laura Angela Simmons Family Living Trust (Simmons) wherein Seitel would enter upon the Simmons property in Shelby County, Texas, to conduct seismic testing.[1]   Simmons conducted a chicken growing operation on the premises, an activity which requires a substantial amount of water in order to keep the chicken houses cool.   To supply the water for this activity, Simmons had two productive water wells and (as additional protection against failure) a backup connection with a city water line. Shortly after Seitel completed its seismic testing on the premises, one of the water wells failed. Simmons brought suit against Seitel under both contract and tort theories, claiming damages of about $15,000.00.   On trial before a jury, Simmons relied on testimony from both Ralph and Laura Simmons and from a water well driller, but they provided no expert on seismic testing. Seitel called no witnesses. A jury awarded damages under both fraud and contract theories (Simmons elected to recover only under the contract theory, thereby dropping the recovery under tort), together with attorney's fees at trial and on appeal.   Seitel has filed this appeal.

On its appeal, Seitel maintains that in the absence of evidence from an expert seismologist, there is no evidence upon which the jury could have found that the seismic testing precipitated the damages Simmons claims and, further, that there was no evidence to support the award of

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.   *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).   We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue.   *See* TEX. R. APP. P. 41.3.

attorney's fees on appeal.   The sufficiency of evidence is the critical factor in this case due to the relief requested by Seitel.   Because Seitel seeks only a reversal and rendition rather than a new trial, we must review the evidence from a "no evidence" standpoint as opposed to a factual sufficiency review.

When employing seismic testing, the tester uses a grid of underground explosions to cause localized vibrations of the earth, and then analyzes readings of those vibrations to create a picture of subterranean formations.   This particular seismic testing project involved a large area, of which the Simmons property was a part.   Very shortly after testing ended, Simmons' previously quite productive water well began slowing production due to the sudden appearance in the water of large and increasing quantities of sand mixed with the water.   About three months after the cessation of the seismic testing, the quantity of sand became sufficient to cause the motor-driven shaft of the submerged well pump to break; the free-wheeling pump shaft overheated the pump and caused it to melt to the casing.   The well pump could neither be replaced nor repaired, and efforts to reset another pump produced only a few gallons per minute of mud as opposed to the approximately forty gallons per minute of clear water which the well had produced before its failure.   Simmons alleged that vibrations in the earth due to Seitel's underground explosions caused an opening or cracking apart of underground formations that resulted in sand infiltration that plugged up its previously extremely good water well.   Ultimately, Simmons had to drill a new well.

**Issues**

Seitel contends that the trial court erred by denying its motion for directed verdict because there is no expert witness evidence to allow a jury to determine that the blasting caused the damage (and that expert testimony was mandatory to prove the case) and that there was no evidence to support the trial court's award of appellate attorney's fees to Simmons.

**The Evidence in Detail**

The background evidence is summarized above. Simmons claims that the failure of the primary water well occurred because of earth tremors caused by the blasts occurring during the seismic testing conducted by Seitel on its property near the well. The seismic testing was conducted by Seitel pursuant to a contract with Simmons to perform that work on Simmons' property over about a two- or three-week period, ending in July 2009. The crucial and controlling language is contained in the following portion of the contract: "Seitel Data will be responsible for damages, if any should occur, due to seismic operations . . . ."

Ralph Simmons (one of the beneficiaries of the trust and the primary operator of the chicken-raising enterprise) testified that a couple of weeks after the testing concluded, he began experiencing problems with the filtration system of his water well and that by November, the well was producing substantial amounts of sand. This caused him to contact Wanda Drilling and Water Development, Inc. (the entity which had drilled the replacement well for Simmons), in what developed into a fruitless exercise to salvage the well. Laura Simmons (Ralph's wife) suggested

4

the correlation between the recently concluded seismic testing operations and the problems with the well.

The evidence presented in this case came from Ralph and Laura and from Jason Key, the vice president and driller for Wanda Drilling.

Ralph testified regarding the approximate dates and locations of seismic blasts conducted by Seitel (across the road from the well) and the onset of problems with the well. He testified that shortly after the seismic blasting had occurred, it abruptly began to be necessary to change the filters on the water from the well five or six times a week, as opposed to changing the filters about once per month before the seismic operations had been conducted. Ralph also testified that his other (and older) water well, located about thirty feet away from the new one, was unaffected, that it had "a lot of iron in it," apparently believing that explained why it was unaffected by the blasting. There is no testimony about whether the wells were set at the same or similar depth or whether they produced water from the same underground stratum.

Ralph also testified that two of his neighbors (about three to four miles away from his house, but also within the blasting zone) had experienced the same sorts of problems with their wells, at about the same time. Ralph testified that one of the neighbors had received some satisfaction from Seitel, while the other was continuing to work with the company.

Laura testified similarly, together with detailed information about costs. She also added that during the tests, the vibrations of the earth could be heard and felt when underground blasts

took place and that a plaque was jarred from a wall in the house on the same property as a result of the shaking which resulted.

Keys is the vice president and driller for Wanda Drilling, a family-run business that has drilled water wells in the area since 1975. Keys has worked in the water well business for about fifteen years and had drilled a couple of thousand wells in the area.

Keys provided the details regarding the well itself, stating that the bore hole was 7-7/8 inches in diameter with a four-inch stainless steel casing inside, a screen on the bottom, and with gravel packed around it. The well hole of the failed well was 432 feet deep, the pump was set at 260 feet, and the water level was at 150 feet. Before it failed, the well would produce forty to fifty gallons a minute of crystal clear water, something it had done since it was drilled in 2003. That uninterrupted production changed within a week or two of the cessation of the seismic tests, when the well began producing enormous amounts of sand and mud along with water. Specifically, Simmons had a 10,000 gallon water storage tank that had to be cleaned out because the well had dumped 3 to 3-1/2 feet of silt into the bottom of it. Keys testified that there should be only a little sand, if any. Keys explained that an excessive amount of sand would cause the well to fail in the fashion that it did, saying that the bottom hole pump sucked sand through the orifice and the sand scarred the impellers, eventually causing the impellers to seize up and break the shaft.

Keys was questioned at length on cross-examination about his understanding of seismic testing; he admitted very frankly that seismic blasting and geologic structure was outside his area

6

of expertise except as it affected the drilling of water wells. He did explain that the geologic soft materials in East Texas made for a large difference from drilling through limestone formations as found in West Texas. He explained that the pump locked to (melted to) the sides of the casing because of heat buildup that could only have happened due to the pump shaft breaking, causing the motor to freewheel at high revolutions per minute. He went on to opine that the excess sand and silt that the well began producing was by far the highest probable cause for the damage. He testified that it was about a ninety-nine percent probability that sanding caused the breakdown.

It is clear that the well began to develop sanding problems for the first time immediately after the seismic testing occurred. The evidence shows that the well was extremely productive and had previously experienced no sanding problems whatsoever, as shown by the unusually long time periods between replacement of the filters (about once per month before the seismic operations) as opposed to having to be changed five or six times every week (after the seismic operations).

There was evidence that for a period of two or three weeks, Seitel discharged five or so underground explosions per day, and that as they worked across the property, they reached a point where they knocked a plaque off the wall in the Simmonses' house, and the shock and vibration from the blasts could readily be felt as well as the sound heard. The evidence shows that a water well drilled in 2003 had been operating efficiently, producing crystal-clear water at a rate of about forty to fifty gallons per minute rate until 2009, when the seismic blasting occurred. Then, about

7

two weeks after the blasting ended, the Simmonses realized that their water bills for the city water they were also hooked up to as an automatic backup had increased noticeably, and then realized they had a problem with the well. The closest underground blast was about 400 feet from the damaged well.

**The Contract for Seismic Testing Operations**

The contract between Seitel and Simmons stated that "Seitel Data will be responsible for damages, if any should occur, due to seismic operations, . . . ." Seitel argues that the term "due to" places a burden on Simmons to prove that the seismic activity was a "proximate cause" of the damages, and then that in order to prove up proximate cause, the plaintiff must provide expert testimony.

**Role of Expert Testimony**

On appeal, Seitel's argument is that as a matter of law, expert testimony is mandatory to provide the proof that it breached its contract. In essence, Seitel maintains that lay testimony is completely insufficient to provide the requisite proof. Thus, Seitel argues, because there is no expert testimony upon which the trier of fact can rely, there is no evidence. Based upon this, Seitel maintains that we must render a take-nothing judgment in its favor.

Whether expert testimony is necessary to prove a matter or theory is a question of law. *FFE Transp. Servs.*, *Inc. v. Fulgham*, 154 S.W.3d 84, 89–90 (Tex. 2004). Pure questions of law

8

are reviewed de novo. *Doan v. Christus Health Ark-La-Tex*, 329 S.W.3d 907, 910 (Tex. App.—Texarkana 2010, no pet.).

Although Simmons filed its pleadings relying on both tort and contract and the jury found in its favor on both theories, Simmons ultimately relied solely on its contract claim. Thus, it is different from the cases cited by Seitel, all of which are based solely in tort. In order for Seitel to prevail, it must show that the analysis under claims made in this type of case is the same in a breach of contract case as it is in a tort claim.

Seitel relies almost exclusively on a memorandum opinion rendered in a tort case, *Adair v. Veritas DGC Land, Inc.*, No. 14-06-00254-CV, 2007 WL 2790362 (Tex. App.—Houston [14th Dist.] Sept. 27, 2007, pet. denied) (mem. op.). Seitel takes the position that the opinion in *Adair* requires expert testimony in all seismic testing damage cases (whether in tort or contract) to show that the damage was caused by the blasting, quoting the following language from that opinion: "The effect of seismic testing on structures is a very technical area and necessitates expert testimony as to whether the testing caused the damage alleged in this case." In support of that statement, the Houston Fourteenth Court of Appeals cited a sentence from *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000): "Expert testimony assists the trier-of-fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier-of-fact understand the evidence or determine a fact issue." As can be seen, this statement does not support the position that the sole means of proof in cases involving

9

seismic testing is by way of expert testimony; rather, it is contained in a discussion about when expert testimony should be admitted and when it may or must be excluded.

Further, *Adair* is a summary judgment case wherein some 262 plaintiffs (ultimately divided into trial groups of thirty) sued Veritas for damages caused to their homes, allegedly as a result of seismic testing; there were a variety of claims, all of which were based on tort theories of recovery. The portion of the plaintiffs in that suit who appealed were denied recovery as the result of a summary judgment in which the losing plaintiffs presented no evidence in their response. The ruling of the Fourteenth court in *Adair* was based on the complete failure of the plaintiffs to provide any summary judgment evidence to counter the evidence provided by the defendants. The statement in the opinion concerning the necessity of expert testimony being required is not quite a sidebar, but is certainly not determinative to the outcome. Any evidence (expert or lay) to raise a pertinent fact question could have been enough to defeat a motion for summary judgment, but none was offered.[2] We also recognize that the *Adair* opinion has no analysis, no discussion, and no authority (legal or otherwise) to support its conclusion.

---

[2]For context, this is the entirety of that section:

A movant's right to summary judgment can be proved solely on the uncontroverted testimony of an expert witness if the subject matter is such that a trier of fact would be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (per curiam). The effect of seismic testing on structures is a very technical area and necessitates expert testimony as to whether the testing caused the damage alleged in this case. *See K-Mart Corp.*, 24 S.W.3d at 360 ("Expert testimony assists the trier-of-fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier-of-fact understand the evidence or determine a fact issue."). Therefore, Veritas's expert

There are very few reported cases that track this particular type of problem. Those in Texas that do address damages alleged to have arisen from seismic testing seem universally to arise from tort actions, not from suits based in contract. There are other Texas cases cited below that touch on the need for an expert in this context, but the Fourteenth court did not utilize them. Those cases also required an expert witness in a tort case, but the stated reason was to provide evidence of a standard of care borne by the tortfeasor that had then been breached, rather than to show that damage occurred.

A number of cases have discussed the need for expert testimony in the context of highly technical matters of design and engineering, and where such a situation presents itself, uniformly and properly require expert testimony. The reasoning behind those reside principally on the idea that a lay person's general experience and common sense will not enable that person to determine causation. *See Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 241 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (concluding motorist in air bag deployment suit required to present expert testimony to establish causation); *Coastal Tankships*, *U.S.A.*, *Inc. v. Anderson*, 87 S.W.3d 591, 603 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding when lay person's general experience and common sense will not enable that person to determine causation, expert testimony is required); *Gen. Motors Corp. v. Harper*, 61 S.W.3d 118, 133 (Tex. App.—Eastland 2001, pet. denied) (reversing plaintiff's jury award in products liability seat belt restraint suit because design expert's

testimony may establish the right to summary judgment if it is uncontroverted, clear, direct, and otherwise free from contradictions and inconsistencies.

11

testimony failed to establish causation); *Sipes v. Gen. Motors Corp.*, 946 S.W.2d 143, 154 (Tex. App.—Texarkana 1997, pet. denied) (stating although expert not required in all cases to establish product defect, "issues may arise on technical matters of design and engineering that would be beyond evidence that lay witnesses with no expertise in these fields could offer").

Similarly, and for the same reasons, in medical malpractice and veterinarian negligence cases, expert testimony is required to prove negligence "[u]nless the mode or form of treatment is a matter of common knowledge or is within the experience of the layperson." *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977); *McGee v. Smith*, 107 S.W.3d 725, 727 (Tex. App.—Fort Worth 2003, pet. denied); *Shook v. Herman*, 759 S.W.2d 743, 747 (Tex. App.—Dallas 1988, writ denied).

Seitel also directs the Court to *Stanolind Oil and Gas Co. v. Lambert*, 222 S.W.2d 125 (Tex. Civ. App.—San Antonio 1949, no writ). In that case, the court held that a jury could not infer the existence of proximate cause from an explosion and a promptly sanded up cistern. The court acknowledged that *res ipsa loquitur*[3] could possibly apply in such a situation, but found the proof to be deficient because there was no evidence of a standard to which the tortfeasor should be held, a standard which was breached. This standard of care must be shown before "a departure

---

[3]*Res ipsa loquitur* applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990).

from that standard may be inferred from occurrences which result in damage. In a case such as this, the matter is one for proof and can not be supplied by common knowledge, . . . ." *Id.* at 126.

Where a standard of care must be met in a negligence case, it is reasonable that expert testimony would be required to show the limits of that standard. *Stanolind Oil* also cites to several older Texas cases approvingly, cases which had roughly the same fact patterns and ruling. Those cases clearly hold that expert testimony is necessary in a tort claim against a seismic blasting company because it was required to establish the standard of care which was then allegedly breached.

In those cases, there was no expert to establish the requisite standard of care; absent expert testimony to set the parameters of the standard of care, the claimant would lose. However, even in those cases, the deficiency did not result in a conclusion that there was no evidence and thus rendition of judgment in favor of defendants, but, instead, resulted in a new trial.

Even in situations involving damage to structures allegedly caused by seismic testing (instead of rock quarries or earthquakes—there are some other jurisdictions with such cases), the cause of the damage can be proven by lay testimony, usually from homeowners. In one Louisiana case,[4] the court went so far as to state that the homeowner's testimony about temporal proximity, physical proximity to the blast, and the damage resulting was sufficient even in the face of expert testimony that the blasting could *not* have caused the damage. In that case, the "scientific impossibility" defense offered by the seismic exploration company consisted of expert testimony

---

[4]Not cited as authority, but for the reasoning which is employed.

13

that it was scientifically impossible for the underground seismic blast detonated by the company to have caused structural damage to nearby buildings. The court held this did not rebut the property owner's initial showing of a causal connection between the blast and damages. *Dykes v. Peabody Shoreline Geophysical*, 482 So. 2d 662, 664–65 (La. Ct. App. 1985).

> If these charges are of sufficient intensity and force so as to penetrate deeply into the earth and rebound to the surface, it would appear inconsistent that such explosions could not and would not produce vibrations horizontally. The effect of Dr. Leet's most informative and learned scientific explanations would lead to the conclusion, which he expressed in most positive terms, that defendant's operations could not and did not cause the damages as plaintiffs alleged; but, as opposed to this scientific hypothesis, we are confronted with the fact, overwhelmingly established by the evidence, that the damages occurred immediately following defendant's operations. To ascribe this fact to sheer coincidence would be a speculative and illogical procedure. Again, while it may be said that such testimony establishes the so-called scientific impossibility of the damage resulting from the explosive operations, the fact is that the only reasonable conclusion is that such damage was caused by and is attributable to defendant's operations.

*Pate v. W. Geophysical Co. of Am.*, 91 So. 2d 431, 433 (La. Ct. App. 1956).

In other contexts, we recognize authority holding that a trier of fact may decide the issue of proximate cause in medical malpractice cases based upon (1) general experience and common sense from which reasonable persons can determine causation, (2) scientific principles provided by expert testimony allowing the fact-finder to establish a traceable chain of causation from the condition back to the event, or (3) a probable causal relationship as articulated by expert testimony. *Chesser v. LifeCare Mgmt. Servs., L.L.C.*, No. 02-10-00291-CV, 2011 WL 3835669 (Tex. App.—Fort Worth Aug. 31, 2011, pet. filed); *Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex.

14

App.—Fort Worth 2003, pet. denied).   As applied in the context of back injuries and causation, appellate courts have reasoned that if multiple causes of the injury are shown to exist, then expert testimony of some level of probability is necessary.   *See W.C. LaRock*, *D.C.*, *P.C. v. Smith*, 310 S.W.3d 48, 59 (Tex. App.—El Paso 2010, no pet.).   These concepts would reasonably apply to this field of scientific endeavor as well.

As explained by the Texas Supreme Court, lay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition.   *Lenger v. Physician's Gen. Hosp.*, *Inc.*, 455 S.W.2d 703, 706 (Tex. 1970).   Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation.   *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984); *Griffin v. Tex. Employers' Ins. Ass'n*, 450 S.W.2d 59, 61 (Tex. 1969); *see, e.g.*, *Ins. Co. of N. Am. v. Kneten*, 440 S.W.2d 52 (Tex. 1969).

As most recently handled by the Texas Supreme Court, an interpretive gloss has been layered onto this concept to explain:

> Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first.   Stated simply, correlation does not necessarily imply causation.   As we noted in *Guevara*, "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions.   But suspicion has not been and is not legally sufficient to support a finding of legal causation." [*Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007)].

15

When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer.

*Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010).

We reiterate, as generally applied in Texas, lay testimony may be used as evidence of causation in certain circumstances, but when expert testimony is required, lay evidence supporting liability is legally insufficient. *Id.* Conversely, when lay testimony can be used and the testimony establishes a sequence of events providing a strong, logically traceable connection between the event and condition, it is not just legally, but factually sufficient to support a jury verdict. *Figueroa v. Davis*, 318 S.W.3d 53, 60–61 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (discussing *Morgan*, 675 S.W.2d at 733 as compared with *Guevara*).

We are not persuaded that expert testimony about the connection between the blasting and the injury is necessary in every case, and will not state such a bright-line rule. A claimant is required, however, to show a causal connection between the event and the injury. Further, in an appeal such as this one (where the review is under a "no evidence" standard), the evidence would not need to be great, but only more than a scintilla or a suspicion. In making such a determination, however, we still must determine what sort of evidence must have been presented, and what evidence actually was presented. The Texas Supreme Court has said,

> Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the

16

causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding.

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006).

In another circumstance, that same court wrote,

[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence.

*Guevara*, 247 S.W.3d at 668.

We believe that a juror, applying commonsense understanding, can tie the relationship of the vibrations of the earth caused by seismic testing with reasonable probability to the concurrent abrupt sanding of a water well. Hence, although expert testimony is often helpful to the understanding of the effects of seismic testing and is often advised, when there has been convincing lay witness evidence presented (as here), it is not absolutely mandatory.

**What Proof Does the "Due To" Phrase in the Contract Require?**

Seitel concentrates on the portion of the contract with Simmons that imposes a contractual liability. That portion of the contract states, "Seitel Data will be responsible for damages, if any should occur, due to seismic operations, . . . ."

Seitel argues that under this contractual provision, Simmons is required to provide evidence to meet the proximate cause standard in order to recover. Simmons responds by saying that the proximate cause standard, while applicable in tort actions, does not apply to contract

17

claims. Further, Simmons argues alternatively that even if the proximate cause standard is required, the evidence presented is sufficient to satisfy the requirement.

Seitel relies largely upon language in *Utica National Insurance Co. of Texas v. American Indemnity Co.*, 141 S.W.3d 198, 202 (Tex. 2004). In the context of analyzing an exclusionary clause in an insurance contract, the court opined that its language excluding injury "due to" the rendition of professional services required a more direct type of causation than the term "arising out of" (which was employed in a parallel paragraph in the same contract) to tie the insured's liability to the manner in which the services were performed. *Id.* at 203. Although the language used by the Texas Supreme Court does contemplate a closer or tighter connection (a "cause and effect" relationship) when the phrase "due to" is used as opposed to the phrase "arises out of," it does not reach the "'due to' equals 'proximate cause'" precision that Seitel advocates. Accordingly, we will not import a tort theory into this contract analysis, but will utilize the concepts as explained by the Texas Supreme Court.

**Standard of Review: Legal Sufficiency**

In reviewing a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Akin*, *Gump*, *Strauss*, *Hauer & Feld*, *L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A legal sufficiency challenge

18

will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006).

**Summary of the Evidence**

The evidence heard by the jury relating to the relationship between the seismic operations and the ruination of the water well can be generally summarized as follows:

1. Simmons had a water well on its property that consistently produced large quantities of clear water, which was relatively free of sand or mud.

2. The water well would have been expected to continue to produce copious clear water for decades.

3. Seitel conducted seismic testing on the same property as the well was located. This seismic testing involved underground explosions, one of which was about 400 feet from the water well.

4. The explosive blasts from the seismic testing shook the ground sufficiently that the vibrations from the explosions caused a plaque to be jarred from the wall of the house (also on the same property as which the water well was located) in which the Simmonses lived.

19

5.      There were numerous explosions of four or five per day for over a week.

6.      Shortly after the seismic testing had been completed, Simmons' well began to disgorge sand and mud as well as water.

7.      The underground pump in the water well was ruined due to the encroachment of sand into the water it was attempting to pump, and the pump overheated and welded itself to the interior of the lining pipe.

8.      Efforts to install a new pump above the ruined pump were unsuccessful because the newer pump likewise began to draw water infused with sand or mud.

9.      Two neighboring property owners also experienced sanding difficulties with their water wells at a time in close proximity to the seismic testing operation.

Again, we recognize that suspicion is not legally sufficient to support a finding of causation in a tort case:   that evidence of an event followed closely by manifestation of conditions which did not appear before the event raises only suspicion that the event at issue caused the condition. *Guevara*, 247 S.W.3d at 668 (discussing *Morgan*, 675 S.W.2d at 733).

Equally, however, the court recognized that these cases do not say that evidence of temporal proximity is irrelevant to causation.   *Id.*

In this case, however, temporal proximity is not all that is provided by the evidence.   The connection that Seitel argues is missing in this instance is whether there is evidence that the blasting could cause sand to be released from previously locked strata to infiltrate the well bore,

20

along with the suggestion that only a seismic or geologic expert could provide such specific information to the jury.

We disagree. Jurors are not blank slates, and can be expected to bring both intelligence, knowledge, and the power to reason logically to the table. Common sense could allow a jury to conclude that when explosives strong enough to bounce waves off various geologic strata are used to shake the ground, the shaking could open previously tight formations to allow sand to filter through the gravel pack into the wellbore. Although Seitel argues at length that seismic testing is in all ways a very detail-ridden, specialized field requiring expert testimony to explain, that overstates the situation. Although the exact mechanism of interpreting seismic waves would fit that description, as would calculations of the placement of explosives and their quantities, the method of detonation, and perhaps the differences observable between different levels of explosive charges (if there were any evidence of such) would require individuals with expertise in the appropriate field to explain, the jury issue as framed in this case requires no such particularized expertise. A person can reasonably understand that an airplane that has lost its wings will fall to earth because its wings are missing—even without understanding the nature of the Bernoulli effect that keeps it airborne with its wings attached. The jury need not employ inductive reasoning (which takes events and makes generalizations) to arrive at the conclusion that the loss of the effective use of the water well was "due to" underground blasting done by Seitel and subsequent tremors of the earth which resulted from it.

21

In this case, the results of explosions causing the ground to vibrate are in some ways entirely clear and straightforward. Simply put, if one places water and gravel in a jar, then sand on top and shake, the sand will work its way to the bottom. That is neither a complex nor involved concept. It is, in fact, nothing more than a grade school science project. There is no reason that an average juror could not understand that basic concept, or the probable result of the actions that were proven to have occurred, even if he could not explain the mathematical and scientific basis for the observable result. There is more basis to support the jury's determination than mere proximity in time, eliminating the maligned "mere suspicion" problem, and thus constitutes some evidence that Seitel was the cause of the injury.

We are not convinced that such a level of proof would meet the factual sufficiency standard of review of a judgment. That is not, however, the problem before us. All that is required here is some evidence, more than a scintilla, providing more than a suspicion to support the verdict. A chain of events was proven to set the stage, and to show the result. The temporal proximity of the events, when combined with the anticipated and entirely reasonable general knowledge jurors would have of the result of shaking the earth, and the interaction between gravel and sand provides such evidence. For this analysis, in the context of the situation arising in this case, we have concluded that expert testimony is not necessary. We, therefore, conclude that there is some evidence (more than a suspicion or a scintilla) to connect the actions of Seitel in its on-site seismic

22

testing and the damage occasioned to the water well. Accordingly, we overrule Seitel's issues on this subject.

**Attorney's Fees on Appeal**

Based upon the jury's verdict, the court awarded $5,000.00 in attorney's fees on appeal to this Court (if Simmons prevails), and $10,000.00 in attorney's fees for appeal to the Texas Supreme Court (should Simmons prevail there).

Seitel argues that the appellate attorney's fees must be reversed because there is no evidence to support the award. The amount of attorney's fees at the trial level was stipulated and is not an issue here. Simmons tacitly admits in his brief that there is no such evidence, arguing that Seitel has not preserved that complaint for our review because it did not complain about the fees until now.

Upon review of the record, the $5,000.00 and $10,000.00 amounts appear in the trial record only in closing arguments, when counsel asked the jury to award those amounts for appeal. The jury did so. There is, however, no evidence to support that award.

Simmons argues that the issue is not preserved for our review, but does so by stating that Seitel did not object to the submission of a charge to the jury asking for attorney's fees. That is not the issue raised here. The issue is whether there is evidence to support the jury's decision.

23

We acknowledge that under TEX. R. CIV. P. 324, an argument that a jury finding is unsupported by the evidence must be raised by a point in a motion for new trial. Seitel's motion for new trial raises this issue. The sufficiency of the evidence is therefore before us for review.

It is clear that there must be evidence. The courts of this State have consistently held that an award of attorney's fees must be supported by competent evidence. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 852 (Tex. 2000), and the burden of proof was on Simmons to establish the reasonable and necessary attorney's fees. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991).

When reviewing legal sufficiency, we examine the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See Wilson*, 168 S.W.3d at 822.

In this case, Simmons offered no evidence of attorney's fees, reasonable, incurred or otherwise. The judgment is therefore without support in the evidence, and the award of appellate attorney's fees must be reversed.

We modify the judgment to delete the award of attorney's fees on appeal, and as modified, affirm.

Bailey C. Moseley
Justice

Date Submitted:        November 16, 2011
Date Decided:          January 18, 2012