# NO. 12-19-00010-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *AMERICAN MIDSTREAM GAS SOLUTIONS, LP,*<br>*APPELLANT* | § | *APPEAL FROM THE 4TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THOMAS EUGENE HALL, JR. AND HEATHER GALE HALL,*<br>*APPELLEES* | § | *RUSK COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

American Midstream Gas Solutions, LP (AMGS), appeals the trial court's judgment in favor of Thomas Eugene Hall, Jr. and Heather Gale Hall. In two issues, AMGS contends the trial court erred in admitting expert testimony and that the evidence is insufficient to support the jury verdict. We reverse and render judgment that the Halls take nothing.

### BACKGROUND

The Halls own a parcel of land in Rusk County, Texas, on which they operate a cattle ranch. Running beneath the surface of their land is a natural gas pipeline operated by AMGS. The pipeline is an old, low yield two-and-a-half inch gathering vacuum line used to pump natural gas at low pressure. It is undisputed that this pipeline leaked on three occasions in 2015 and 2016.

The first leak occurred in October 2015. It was repaired and the Halls do not allege that this leak caused the death of any of their cattle. The second leak occurred in March or April 2016 at a different location from the first leak. Thomas's brother Paul, who assists them in their cattle operation, discovered the leak while the Halls were out of town. The leak occurred in a low-lying drainage slough area of the property. Paul observed AMGS's repair of the second leak, which he described as a clamp that he thought would fail. Thomas returned approximately two weeks later

and did not see any problems with the leak. No one reported the leak to the Texas Railroad Commission. Of the approximately 110 cattle owned by the Halls, 87 of them had access to the area where the second leak occurred.

In late July 2016, several months after the second leak, the Halls discovered the death of one of their cows that appeared to be healthy and pregnant. They buried the cow. Several days later, three more cows died, and additional cows died through September and early October. A total of twenty-two cows died during this period, including several that aborted or gave birth to stillborn calves, or who died while giving birth. At least twelve calves died, although the exact number is unknown. Thomas observed that some of the cows looked like they had just "come out of a show ring, and some of them just went to losing weight just drastically" at the time of their death.

The third leak occurred in late December 2016. All of the cows that died, except for one, did so prior to this leak. The remaining cow showed signs of illness in 2016 and was eventually euthanized in early 2017. The Halls reported this leak to the Texas Railroad Commission. Consequently, there was significant photographic, documentary, and testimonial evidence concerning the investigation and remediation of the third leak that was later presented at the ensuing trial. However, Thomas admitted that the cattle already died prior to the third leak and that this leak did not kill any of his cattle.

The Halls hired Dr. David Corley, their veterinarian, to investigate the cattle's cause of death. Thomas believed Dr. Corley first visited the property in August, but Dr. Corley's records reflect, and he agreed, that his first visit was in September 2016, after approximately twenty of the cattle had already died. Accordingly, Dr. Corley did not examine any of those cows.

Dr. Corley observed the remaining cows and noted that a few of them were thin, but most were not. Dr. Corley took water samples from the pipeline leak location and sampled plants for identification. He sent the samples to the Texas A&M Veterinary Medical Diagnostic Laboratory for testing, a lab he trusts and upon which he relies. The test results showed that the plants were not poisonous to the cows, and that the water sampled from the pipeline leak location was free from any petroleum products and suitable for livestock consumption. He also examined, and was unable to find anything wrong with, the Halls' herd management practices, vaccination practices, the cattle's feed and hay, and looked for objects left in the field which might cause cattle to sicken such as fertilizer or old car batteries. Dr. Corley also ruled out lightning strikes and disease.

However, a few days later, Dr. Corley's partner visited the property and took tissue samples from a dead calf showing that it had "intra-alveolar meconium, moderate (meconium aspiration syndrome)" in its lungs, and that the potential causes of death were meconium syndrome, fetal hypoxia, and fetal stress due to dystocia, fetal disease, or placental insufficiency, none of which are related to the cow's ingestion of petroleum.

Dr. Corley visited the property again in February 2017 to examine the remaining sick cow, which he euthanized and ordered a necropsy along with a test designed to detect petroleum in the cow's rumen. The results did not detect ingestion of any petroleum product. Dr. Corley stated that this did not surprise him, because that result also occurred in other cases in which he knew the cow ingested petroleum. However, the test result showed the presence of a worm parasite Trichostrongyle. A normal test shows an amount of five or less. This cow had an elevated result of 41.8. Dr. Corley noted that there are a variety of causes of worms, but they can spread throughout a herd, and can cause a cow to become anemic and die or to abort a fetus, and can also cause fetal hypoxia. The test reports also showed that the cow had bacteremia, which is bacteria in the cow's bloodstream. It causes inflammation of the heart, changes to the spleen and liver, and is not a normal finding in a healthy cow. Dr. Corley noted that bacteremia cannot be caused by a cow ingesting petroleum.

Despite these findings, Dr. Corley was unable to determine any medical cause for the sudden death of the cattle. Based on the timing and number of deaths, the fact that the only cattle to die had access to the area where the pipeline leak occurred, and the lack of any other cause, Dr. Corley concluded that it was more likely than not that they died from their exposure to the materials spilled from the pipeline leak. Specifically, he believed that the gas leak was his "strongest suspicion" as to the cause, and that he believed the cause was "something in the water" after ruling out the other possibilities.

Accordingly, the Halls filed suit against AMGS, alleging that its negligence in failing to properly inspect, maintain, and repair its pipeline proximately caused the death of their cattle, and sought to recover damages for their market value prior to death. AMGS filed a motion to exclude Dr. Corley's testimony alleging that it was speculative and unreliable on causation. After a hearing, the trial court denied the motion.

The matter proceeded to a jury trial, whereupon AMGS renewed its objections to Dr. Corley's testimony, which were denied by the trial court. AMGS also moved for a mistrial and

3

directed verdict based on the trial court's admission of Dr. Corley's testimony after the Halls rested, which were also denied. During the trial, AMGS offered evidence from its own expert, Dr. Tam Garland. Dr. Garland is a veterinary toxicologist and was the head of the toxicology section of the Texas A&M Veterinary Medical Diagnostic Laboratory. Dr. Garland testified that the reports and lab results she reviewed in this case presented no indications that the cattle had lesions in their lungs consistent with petroleum ingestion or other symptoms suggesting that the cattle ingested petroleum. The jury found that AMGS was negligent and that its actions proximately caused the death of the Halls' cattle. The jury awarded $89,700.00 in damages to the Halls. AMGS filed this appeal.

## PARTIAL RECORD

When AMGS perfected its appeal and requested the reporter's record, it requested all the transcripts from the trial, but designated only some of the exhibits to be included within the record. The Halls argue in their brief that we should apply the presumption that the omitted portions of the record are relevant and support the trial court's judgment in the absence of a statement of appellate issues by AMGS. *See* TEX. R. APP. P. 34.6(c)(1), (4); *Garcia v. Sasson*, 516 S.W.3d 585, 590-91 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Accordingly, their argument continues, we need not consider the merits of this appeal. We disagree. Prior to submission of this appeal, AMGS moved for leave to supplement the record, which we granted. *See* TEX. R. APP. P. 34.6(d). The court reporter supplemented the record to contain the missing exhibits admitted at trial as requested by AMGS. Therefore, the appellate record is complete, the presumption does not apply, and we may consider the merits of the appeal.

## EXPERT TESTIMONY REQUIRED ON CAUSATION

Before we discuss the admissibility of Dr. Corley's expert testimony, we first must determine whether expert testimony was necessary to prove causation.

Whether expert testimony is necessary to prove a particular issue is a question of law that we consider de novo. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89 (Tex. 2004). In the negligence context, the Texas Supreme Court has held that expert testimony is necessary "when the alleged negligence is of such a nature as not to be within the experience of the layman." *Id.* at 90 (quoting *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982)). "Proof other than expert testimony

4

will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006); *Seitel Data, Ltd. v. Simmons*, 362 S.W.3d 782, 791–92 (Tex. App.—Texarkana 2012, no pet.). "Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks*, 206 S.W.3d at 583; *Seitel Data*, 362 S.W.3d at 792. "[W]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *Seitel Data*, 362 S.W.3d at 791.

Plaintiffs seeking relief for injuries of any nature caused by exposure to or migration of a toxic substance must meet the stringent proof requirements imposed by the Texas Supreme Court in *Havner* and its progeny, including the necessity of expert testimony. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 715-16, 720 (Tex. 1997) (expert testimony is necessary in a toxic tort case in order to prove (i) the applicable standard of care, (ii) that the defendant's conduct more than doubled the risk, as shown by two epidemiological studies, (iii) that the plaintiff's injuries were caused by the defendant's conduct, and (iv) that the plaintiff's injuries were not caused by other possible sources). For example, Texas courts have held that expert testimony is required to establish causation when the claim arises out of the alleged emissions and migration of hazardous substances from nearby oil and gas operations. *See Cerny v. Marathon Oil Corp.*, 480 S.W.3d 612, 620 (Tex. App.—San Antonio 2015, pet. denied).

Similarly, the general rule is that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of lay persons. *See Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007). Moreover, in medical malpractice and veterinarian negligence cases, expert testimony is required to prove negligence unless the mode or form of treatment is a matter of common knowledge or is within the experience of the layperson. *Seitel Data*, 362 S.W.3d at 789 (citing *McGee v. Smith,* 107 S.W.3d 725, 727 (Tex. App.—Fort Worth 2003, pet. denied) (veterinarian negligence case generally requires expert testimony)).

This case involves whether cattle's alleged exposure to substances containing hydrocarbons and other related substances from a pipeline leak in the natural gas delivery process proximately caused their death. This determination is outside the scope of a layperson's common knowledge or experience. For example, the analysis requires identification of the substance, analysis of how much of it must be ingested in order to cause death, and ruling out other plausible

5

causes such as disease in animals that cannot communicate with their human caretaker. *See, e.g., Duke Energy Field Servs., L.P. v. Meyer*, 190 S.W.3d 149, 152-54 (Tex. App.—Amarillo 2005, pet. denied) (holding evidence legally sufficient because company failed to raise need for expert testimony or object to reliability of cattle owner's testimony that he believed cows ingested petroleum from company's pipeline that caused them to abort calves, but evidence was factually insufficient because there was no evidence cows ingested oil, how much oil, how many cows, how much oil is required to cause aborted calf, cows were asymptomatic for oil exposure, and lab results failed to indicate oil exposure); *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 933–34 (Tex. App.—Texarkana 1997, pet. denied) (holding veterinary expert lacked reliable foundation for testimony and expert testimony was insufficient to support finding that contaminated cattle feed caused hardware disease in all 200 of plaintiff's cows).

Accordingly, we hold that the Halls must have admissible competent expert testimony to establish causation. Without it, the evidence is legally insufficient to support the verdict. *See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 838 (Tex. 2014).

ADMISSIBILITY OF EXPERT TESTIMONY

In its first issue, AMGS contends that Dr. Corley's testimony on causation was inadmissible because it was speculative, unreliable, and that he failed to rule out other plausible causes of death. In its second issue, AMGS argues that the evidence is insufficient to support the trial court's judgment. Since these issues are related, we address them together.

**Standard of Review**

A qualified expert witness "may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Expert testimony is admissible when (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *See Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006).

We review a trial court's rulings admitting expert testimony, including rulings on the reliability of expert testimony, for an abuse of discretion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347–48 (Tex. 2015). If a party challenges an expert's opinion as

6

incompetent and therefore no evidence, we review the entire record for legal sufficiency. **Whirlpool Corp. v. Camacho**, 298 S.W.3d 631, 638 (Tex. 2009).

**Applicable Law**

To constitute competent evidence, expert testimony must be based on a reliable factual foundation. *See* **Mel Acres Ranch**, 443 S.W.3d at 832-33; **Mack Trucks**, 206 S.W.3d at 578. The reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions. **Kerr-McGee Corp. v. Helton**, 133 S.W.3d 245, 254 (Tex. 2004). In **Robinson**, the court identified six non-exclusive factors for consideration in deciding the reliability of proffered expert testimony. **E.I. du Pont de Nemours & Co., Inc. v. Robinson**, 923 S.W.2d 549, 557 (Tex. 1995). But these factors are not always useful. **Cooper Tire & Rubber Co.**, 204 S.W.3d at 800. When the subject matter requires an expert to rely on experience, knowledge, and training rather than a certain methodology to reach a conclusion, a court makes the reliability assessment by determining whether there is "too great an analytical gap between the data and the opinion proffered." **Mack Trucks**, 206 S.W.3d at 578 (citing **Gammill**, 972 S.W.2d at 726).

We are not required to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect. **Gunn v. McCoy**, 554 S.W.3d 645, 663 (Tex. 2018). Analytical gaps may include circumstances in which the expert's opinion is based on assumed facts that vary materially from the facts in the record or the expert's opinion is based on tests or data that do not support the conclusions reached. *Id.* at 662; **Gharda USA**, 464 S.W.3d at 349. The expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion. TEX. R. EVID. 705(c). The admission of unreliable expert testimony is an abuse of discretion. *See* **Gharda USA**, 464 S.W.3d at 347–48. Moreover, unreliable expert testimony is legally no evidence. **Seger v. Yorkshire Ins. Co.**, 503 S.W.3d 388, 410 n.23 (Tex. 2016); *see also* **City of Keller**, 168 S.W.3d at 813. Causation opinions predicated on possibility, speculation, and surmise are no evidence. *See* **Havner**, 953 S.W.2d at 711-12. If "the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge." **Windrum v. Kareh**, No. 17-0328, 2019 WL 321925, at *5 (Tex. Jan. 25, 2019).

A complaint that the expert opinion is conclusory or speculative, on the other hand, is not a challenge to the underlying reliability of the methodology employed by the expert. *See id.* at *4. An expert's statement or opinion is conclusory when: (1) he asks the jury to take his word that his

7

opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion. *Id.* Expert testimony is speculative if it is based on guesswork or conjecture. *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012). To avoid being conclusory or speculative, an expert must explain how and why the negligence caused the injury. *Gunn*, 554 S.W.3d at 665 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)).

When the evidence demonstrates that there are other *plausible* causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *Id.* (citing *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable evidence, not simply the expert's opinion. *Id.* (citing *Jelinek*, 328 S.W.3d at 536).

**Discussion**

AMGS does not dispute Dr. Corley's qualifications generally as a veterinarian, but it does contend that his opinion is unreliable, conclusory or speculative, and that he failed to rule out other plausible causes of the cattle's death, namely disease from worms and bacteremia.

Dr. Corley testified that the gas leak was his "strongest suspicion" as to the cause of death and he believed something "in the water" caused their death after ruling out other possibilities. He further stated that he "couldn't find anything. That's the only thing that I can put—that's top of my list, you know, if they've been in there to clean up, and now we've got dead cows. I mean, that's the most likely culprit . . . ." On cross-examination, however, Dr. Corley admitted that this conclusion was speculative. Specifically, the following exchange took place:

> Q. Good afternoon -- good morning, rather, Dr. Corley. Dr. Corley, I want to talk to you about the time line of things first. Before we do that, Dr. Corley, you don't have a medical opinion, without speculating, as to the cause of death, what killed the cattle, do you?
>
> [The Halls' Counsel]: I'm going to object to the form of that. It's compound.
>
> [AMGS's Counsel]: It's one question.
>
> The Court: All right, I'll overrule the objection.
>
> Q. You want me to repeat it?
>
> A. Yes, please.

8

> Q. Without speculating, you don't have a medical opinion as to what caused the death of these cattle, do you?
>
> A. No.

Dr. Corley testified later on cross-examination as follows:

> Q. [AMGS's Counsel] Doctor, just so we're clear because of all the confusion, do you have a medical opinion, without speculating, of the cause of death of the cattle?
>
> A. I do have a medical opinion, but it's -- I don't have any lab results to back it up.
>
> Q. So it's speculation?
>
> A. Speculation, yeah.

Other than stating that the cattle had access to the area with the pipeline leak, Dr. Corley did not further explain his medical opinion or how the pipeline leak caused their death.

Causation opinions predicated on possibility, speculation, and surmise are no evidence. *See **Havner***, 953 S.W.2d at 711-12. Dr. Corley offered no testimony on the type of substance that leaked, how much was ingested by the cows, how much is required to kill the cows, what signs or symptoms suggest petroleum ingestion, or whether any cows exhibited those signs. He did state that causation is often difficult to determine, that diagnostic testing has not advanced much over time, tissue samples are difficult to timely obtain, and that the results can be inconclusive.

In contrast, the evidence shows that the water sample taken from the second leak area contained no petroleum products and was suitable for livestock consumption. Dr. Corley also admitted that there was no way to scientifically determine that materials from the leak caused the cattle's death because no one observed the cows consume the substance and the lab results show no problems with the water sampled from the leak site. Furthermore, the only cow tested showed no petroleum products in its rumen. Dr. Corley testified that he was not surprised that the test showed no petroleum products in the rumen, because in his past experience, a cow ingested diesel and regurgitated it, which created a gas inhaled in the lungs that causes pulmonary edema and can kill the cow. But he stated this would cause the cow to die quickly. This theory is not consistent with the deaths here, because no cows died until several months after their alleged exposure and AMGS's remediation of the second leak.

Paul testified that after the second leak, he observed the cleanup crew pump the substance from the leak and then spray it on the hay field. Even assuming this is true, Dr. Corley testified that he was unaware of this fact at trial, and implicitly, that it did not form part of his opinion. In fact, he did not discuss this further, such as how spraying the substance on the field could harm the cows or the quantities necessary to harm them. Dr. Corley's testimony contains fatal gaps in his analysis because the tests or data do not support the conclusions reached. *See* TEX. R. EVID. 705(c); *Gunn*, 554 S.W.3d at 662; *Gharda USA*, 464 S.W.3d at 349. Similarly, Dr. Corley's analysis is speculative or conclusory because the bases offered to support his suspicion that there was something in the water that caused the cows to die do not actually support his opinion. *See Windrum*, 2019 WL 321925, at *4.

Finally, when the evidence demonstrates that there are other *plausible* causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *Gunn*, 554 S.W.3d at 665 (citing *Bustamante*, 529 S.W.3d at 456; *Havner*, 953 S.W.2d at 720). Dr. Corley stated that he examined the Halls' herd management practices, vaccination practices, the cattle's feed and hay, and looked for objects left in the field which might cause cattle to sicken such as fertilizer or old car batteries. Dr. Corley also claims that he ruled out disease.

Here, all but one of the cows died prior to Dr. Corley's examination of the remaining cow. Dr. Corley performed testing on that cow, and his partner performed a necropsy on one of the deceased calves. Both showed signs of disease that Dr. Corley admitted could have killed them, but he failed to negate. The Halls point to the fact the bulls and heifers were separated from the cows that had access to the leak area, and none of them were harmed. In other words, only cows that had access to the leak area died. But Dr. Corley also acknowledged that worms can spread throughout the herd. This occurs when a cow that has worms defecates, and the worms migrate through the pasture and are consumed by other cows. He also admitted the worms can be fatal and can cause symptoms similar to those experienced by the sick cow he euthanized. Worms can also cause a cow to abort a calf. Worms can cause a calf to be potbellied and suffer fetal hypoxia like the calf examined by Dr. Corley's partner. Therefore, it is plausible that worms spread throughout the herd that shared this common area, while also explaining why the segregated bulls and heifers did not contract worms. Yet, Dr. Corley ignored this and failed to negate it, even though it was a plausible cause of death. Likewise, he also failed to rule out the bacteremia infection as a cause.

In summary, the jury was left to guess, as did Dr. Corley, as to whether the cows' access to the pipeline leak led to their exposure to the substance, along with their consumption of it in sufficient quantities so as to cause their death, even though the scientific testing strongly tends to exclude the leak as the cause, and in the face of other evidence that disease and parasites could have also caused their deaths. *See **Windrum***, 2019 WL 321925, at *5 (stating that if "the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge"); *see also **Duke Energy Field Servs.***, 190 S.W.3d at 153-54 (holding there was no evidence cows ingested oil, how much oil, how many cows, how much oil is required to cause aborted calf, and lab results failed to indicate oil exposure); ***Purina Mills***, 948 S.W.2d at 933–34 (holding veterinary expert lacked reliable foundation for testimony and expert testimony was insufficient to support finding that contaminated cattle feed caused hardware disease in all 200 of plaintiff's cows).

AMGS's first and second issues are sustained. When expert testimony is admitted over objection and determined to be inadmissible on appeal, and the trial court's judgment cannot be sustained without the testimony, the appropriate disposition is to reverse and render judgment. *See **Mel Acres Ranch***, 443 S.W.3d at 838.

## DISPOSITION

Having sustained AMGS's two issues, we ***reverse*** the trial court's judgment and ***render*** judgment that the Halls take nothing.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered September 27, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 27, 2019**

**NO. 12-19-00010-CV**

**AMERICAN MIDSTREAM GAS SOLUTIONS, LP,**
Appellant
V.
**THOMAS EUGENE HALL, JR. AND HEATHER GALE HALL,**
Appellees

Appeal from the 4th District Court

of Rusk County, Texas (Tr.Ct.No. 2017-024)

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that the judgment should be reversed and rendered.

It is therefore ORDERED, ADJUDGED and DECREED by this court that the judgment of the trial court in favor of Appellees, **THOMAS EUGENE HALL, JR. AND HEATHER GALE HALL**, be, and the same is, hereby **reversed** and judgment is **rendered** that Appellees, **THOMAS EUGENE HALL, JR. AND HEATHER GALE HALL,** take nothing. All costs in this cause expended in this court be, and the same are, hereby adjudged against the Appellees, **THOMAS EUGENE HALL, JR. AND HEATHER GALE HALL,** for which let execution issue; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*